UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WINSTON GREY BRAKEALL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DENNIS KAEMINGK, ROBERT DOOLEY, DARIN YOUNG, TROY PONTO, DERRICK BIEBER, TIM MEIROSE, LANA JACKSON, RILEY DEGROOT, RYAN VANDERAA, WILLIAM ALLEN, J. ZOSS, J.C. SMITH, AILEEN WINTERS, TRAVIS RIPPERDA, JOSHUA KAUFMAN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, GEORGE DOMINGUEZ, UNKNOWN INMATES, UNKNOWN PAROLE DEPARTMENT EMPLOYEES, UNKNOWN SEX OFFENDER MANAGEMENT PANEL EMPLOYEES, UNKNOWN DEPARTMENT OF CORRECTIONS EMPLOYEES,<br><br>                    Defendants. | 4:16-CV-04057-KES<br><br><br><br>ORDER WAIVING INITIAL PARTIAL FILING FEE, DENYING MOTION REQUESTING ORDER, GRANTING MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT, DISMISSING COMPLAINT IN PART, AND ORDERING SERVICE |

**INTRODUCTION**

Plaintiff, Winston Grey Brakeall, is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls. He filed a pro se civil rights lawsuit under 42 U.S.C. § 1983 and requested leave to proceed in forma pauperis under 28 U.S.C. § 1915. Docket 1; Docket 3. The court granted this request and ordered Brakeall to pay an initial partial filing fee of $100.70 by June 3, 2016. Docket 7. Brakeall now moves to pay the filing fees from his frozen savings account.

Docket 11. He also moves for leave to file a supplemental complaint. Docket 13. For the reasons below, the court waives Brakeall's initial partial filing fee, grants him leave to file a supplemental complaint, screens his complaint under 28 U.S.C. § 1915A, dismisses the complaint in part, and directs service.

## FACTUAL BACKGROUND

According to his complaint, Brakeall was living with his parents in Illinois in November 2014. Docket 1 at ¶ 27. On November 4, 2014, Brakeall was taken into custody on a warrant from the South Dakota Board of Pardons and Paroles (the Board). *Id.* He was transferred to the SDSP. *Id.* at ¶ 28. When he arrived at the Jameson Prison Annex (JPA) in SDSP, he told the admitting officer that he would not be safe in the general population. *Id.* He was told to discuss it with staff in the morning and he was housed in the JPA. *Id.*

As Brakeall got ready for breakfast the next morning, he heard other prisoners call him "Chomzilla," a sobriquet derived from "child molester," a reference to Brakeall's crime, and "Godzilla," a reference to Brakeall's immense size (Brakeall is 6' 9", 330 pounds). *Id.* at ¶¶ 29, 54. This was an insult used against Brakeall during the sixteen years he was incarcerated. *Id.* at ¶ 29.

After breakfast, Brakeall was confronted by his cellmate, a gang member. *Id.* at ¶ 30. The cellmate said he had been ordered to assault Brakeall, but had refused the order to save his parole eligibility. *Id.* Brakeall's cellmate was beaten by the gang for refusing to assault him. *Id.* at ¶ 33. Brakeall told prison staff about the threats against him, but nothing was done. *Id.* at ¶ 31. Brakeall did not want to cause trouble because he also

2

wanted to save his parole eligibility. *Id.* He was still awaiting his parole revocation hearing at the time. *Id.* at ¶ 34. Brakeall's cellmate told him that other prisoners were spreading rumors about him, saying that he had been re-incarcerated because he had committed another sex offense. *Id.* at ¶ 32. The cellmate claimed the rumors were spread to encourage prisoners to assault Brakeall. *Id.*

On December 11, 2014, JPA staff told Brakeall he was going to be transferred to the general population in East Hall to await his parole revocation hearing. *Id.* at ¶ 34. Brakeall told staff he would be in danger in East Hall. *Id.* Staff told him he could relocate and discuss it with staff in East Hall or go to the Segregated Housing Unit (SHU) for refusing a transfer. *Id.* In order to protect the possibility of parole, Brakeall went to East Hall. *Id.*

When he arrived, Brakeall immediately warned staff, including Unit Manager Tim Meirose that he was in danger. *Id.* at ¶¶ 35-36. Meirose told Brakeall that there were no cells other than the one he had been assigned. *Id* at ¶ 36. He told Brakeall he could accept his cell or go to the SHU for refusing a cell. *Id.* Brakeall accepted his cell. *Id.* Two days later, on December 13, 2014, Brakeall was assaulted in the SDSP dining hall. *Id.* at ¶ 37.

After the assault, while being evaluated by health services, an unknown correctional officer gave Brakeall three options: he could go back to his cell, he could refuse housing, or he could ask for protective custody. *Id.* at ¶ 38. The officer told Brakeall that seeking protective custody "gives you kind of a reputation as a punk." *Id.* Brakeall returned to his cell. *Id.* After the assault,

the assailant told the unknown correctional officer that the threat against Brakeall from gangs in East Hall was severe. *Id.* at ¶ 39. The officer then sent Brakeall to West Hall for his protection. *Id.* No photographs of Brakeall's injuries or statements were taken by prison staff, and no incident report was made. *Id.* at ¶¶ 40, 41.

On December 14, 2014, Brakeall's arrest warrant was dropped, and he was placed on parole. *Id.* at ¶ 42. Two days later, he was transferred to the Unit C Trustee facility in the Community Transition Program. *Id.* Starting in January 2015, Brakeall was given time off the unit for treatment, but otherwise confined at the prison. *Id.* at ¶ 43.

In March 2015, Brakeall was arrested and placed on a ninety day administrative detainer for failing a polygraph test. *Id.* at ¶ 44. There was no evidence or allegations of any criminal activity. *Id.* For the rest of March 2015, Brakeall was held in JPA. *Id.* at ¶ 45. He was threatened by other inmates and his belongings were stolen. *Id.* Again he told prison staff what was happening, but they did nothing. *Id.*

Brakeall's parole agent Travis Ripperda made an offer to him: if Brakeall would pay for sixty days of GPS monitoring, new polygraph tests, and weekly treatment, he would be put back on parole. *Id.* at ¶ 46. Brakeall's parents paid. *Id.* at ¶ 47. Brakeall alleges that these things are normally cheaper than the amount he paid and normally subsidized or paid for by the parole department. *Id.* After payment, Brakeall was returned to CTP. *Id.*

Under policies enacted by Dennis Kaemingk, Brakeall was allowed to leave Unit C only for weekly meetings with Ripperda, treatment, and to search for a job. *Id.* at ¶ 48. In September 2015, Aileen Winters was assigned as Brakeall's parole officer. *Id.* at ¶ 49. At this time, Brakeall was confined to Unit C except for work (he had been hired at a fast food restaurant), treatment, and chores such as laundry. *Id.* at ¶ 50. Brakeall was not allowed free time outside of the prison, even though he was on parole. *Id.*

On December 1, 2015, Brakeall was again arrested for failing a polygraph test. *Id.* at ¶ 51. He was placed on administrative detainer and moved to JPA. *Id.* The next day, he was transferred to East Hall. *Id.* at ¶ 52. Brakeall warned several members of prison staff, including Unit Manager Derrick Bieber, that he was in danger. *Id.* Brakeall was again given the option of accepting his cell in East Hall or being written up and sent to the SHU. *Id.* In order to save his parole eligibility, he chose the former. *Id.*

On December 14, 2015, Winters came to Brakeall's cell and told him that she and J.C. Smith, her supervisor in the parole department, planned to have Brakeall stay in SDSP for 90 days, take a polygraph, and if he passed, he would be paroled back to CTP. *Id.* at ¶¶ 13, 53. In January 2016, two inmates told Brakeall that the gangs in East Hall warned them not to associate with Brakeall and that the gangs were going to assault Brakeall or extort money from him. *Id.* at ¶ 53. They explained that because of Brakeall's size and the fact that he would not fight back in order to protect his parole eligibility, other

prisoners planned to attack him to "make their bones" without fear that he would fight back. *Id.* at ¶ 54.

Brakeall told Bieber, who said he would "look into it." *Id.* at ¶ 56. When Brakeall told other correctional officers, they told him that without the names of inmates who were going to attack him, they could do nothing to protect him. *Id.* at ¶ 57. Brakeall told Winters about the threats, but she told him to tell the prison staff. *Id.* at ¶ 58.

On February 2, 2016, Brakeall was assaulted. *Id.* at ¶¶ 59, 60. He was in the recreation building, playing cards with another inmate when he was struck from behind and knocked to the floor. *Id.* at ¶¶ 60-61. Because there were no correctional officers in the card room, Brakeall was beaten by three inmates for at least one minute, the assailants punching and kicking him in the head, back, and torso. *Id.* at ¶¶ 62-63. The attack did not stop until the assailants left on their own accord. *Id.* at ¶ 67. By that time, Brakeall was bleeding profusely from his nose and head, and his friend, a fellow inmate, worried that his skull had been fractured. *Id.* at ¶¶ 67, 68.

After the assault, Brakeall, covered in blood and still bleeding, found a correctional officer and told him about the attack. *Id.* at ¶ 72. The officer called for an escort to take Brakeall to health services. *Id.* at ¶ 73. After several minutes, Lieutenant Ryan Vanderaa escorted Brakeall to health services. *Id.* at ¶¶ 73-74. Brakeall told Vanderaa that he wanted the attackers to be criminally charged because he was a parolee on an administrative detainer, not an inmate. *Id.* at ¶ 74. Vanderaa said that the attackers would be charged

and that pictures of Brakeall's wound would be taken as would statements about the attack. *Id.*

Health services bandaged Brakeall's wounds. *Id.* at ¶ 75. His injuries included:

> [A] deep trauma nose bleed; right temple laceration; left temple abrasion; extensive bruising and swelling of the left ear; extensive bruising to both forearms; abrasions on his right elbow; "goose eggs," pain and swelling at impact points across both temples, across the back and crown of his skull, at the base of the skull where the spine enters; muscular trauma to the neck, jaw, and torso; and bruising which reached Plaintiffs lower back.

*Id.* at ¶ 71. While being seen by health services, Brakeall complained of dizziness and nearly fell over multiple times. *Id.* at ¶ 75.

After Brakeall was seen by health services, Vanderaa handcuffed him and brought him to the SHU for investigative purposes. *Id.* at ¶ 76. When they got to the SHU, Vanderaa was told that the inmates who attacked Brakeall were being taken to the SHU, so Vanderaa took Brakeall to the SHU main gate and put him in a holding cell. *Id.* at ¶¶ 77-79. Brakeall was still bleeding and asked prison staff for help, but they did nothing. *Id.* at ¶¶ 80-81. Forty minutes later, SHU Case Manager Lana Jackson came to the holding cell and told Brakeall that he was going back to East Hall. When she saw he was still bleeding, she took him to health services first. *Id.* at ¶ 82.

After leaving health services, Brakeall dressed and went to lunch. *Id.* at ¶ 85. His nose started bleeding again and correctional officer J. Zoss ordered him to eat by himself. *Id.* at ¶ 85. Because he was still bleeding, Brakeall abandoned his lunch. *Id.* Brakeall was taken to health services in order to go

7

to the emergency room at the Avera trauma center. *Id.* at ¶ 86. He was escorted by correctional officers William Allen and Zoss. *Id.*

Allen and Zoss told the medical staff that the video from the recreation building showed that three inmates attacked Brakeall. *Id.* at ¶ 87. They also said that one attacker was a parolee on a 60 day administrative detainer and that the assault was gang related. *Id.* After numerous attempts, the doctor was able to stop Brakeall's nose bleed. *Id.* at ¶ 90. Brakeall believes he lost more than a pint of blood. *Id.* at ¶ 91. The doctor ordered a CAT scan because Brakeall could not remember whether he was hit in the face, but the scan showed no fractures or internal hemorrhages. *Id.* at ¶¶ 92, 96.

While they waited for the results of the scan, Allen and Zoss discussed overtime work at the prison. *Id.* at ¶ 94. Allen said he expected to do over twenty hours of overtime that week. *Id.* They also discussed "stealing" correctional officers from recreation, when correctional officers who are supposed to be monitoring the recreation building are taken to transport an inmate. *Id.* at ¶ 95. The correctional officers stated that the group assigned to the recreation building would not be enough even before some were "stolen." *Id.* Inmates later told Brakeall that SDSP was operating with nine fewer officers than required on the day he was assaulted. *Id.* at ¶ 66. He was also told that the staff member responsible for monitoring the video feed in the recreation building was playing games on her phone. *Id.* at ¶ 65.

When Brakeall returned to SDSP, he was put in his original cell. *Id.* at ¶ 97. He was not taken to health services to discuss treatment. *Id.* At no point

did prison staff take pictures of his injuries, take statements from witnesses or the people involved in the assault, or do anything to secure evidence from the scene of the assault. *Id.* at ¶¶ 73, 75. Usually these are documented after fights at SDSP. *Id.* at ¶ 129.

After dinner on February 1, 2015, inmate George Dominguez told Brakeall that the gangs in East Hall wanted him out of East Hall and that he would be attacked if he ever took recreation. *Id.* at ¶ 100. That night, a nurse came to Brakeall's cell to deliver medication and told him to go to health services the next day. *Id.* at ¶ 102. Brakeall told the correctional officer who escorted the nurse about Dominguez's threats. *Id.* at ¶ 103. The correctional officer told Brakeall to tell staff in the morning. *Id.*

The next day, when Brakeall tried to go to health services, a correctional officer in East Hall told him nobody needed to see him in health services. *Id.* at ¶ 104. When Brakeall told the correctional officers about the threats against him, the officer put his hand on his handcuffs and asked Brakeall, "Do you want to refuse housing?" *Id.* at ¶ 105. Brakeall returned to his cell. *Id.*

Later that day, Brakeall went to recreation. *Id.* at ¶ 106. Allen was stationed at the gate, and Brakeall told him about the most recent threats. *Id.* That day, there were four correctional officers supervising over 200 inmates and parolees in the recreation building. *Id.* at ¶ 107. Brakeall went to the walking track. *Id.* at ¶ 108. There were no cameras or officers in the area. *Id.* at ¶ 109. Dominguez approached Brakeall and struck him in the throat with his forearm. *Id.* at ¶ 108. Brakeall went to the card room, found two officers

9

there, and told them that Dominguez had assaulted him. *Id.* at ¶ 110. The officers told Brakeall to wait at the gate. *Id.*

When Brakeall went to the gate, Dominguez approached and began circling Brakeall. *Id.* at ¶ 111. Officers arrived at the gate, handcuffed Dominguez, and removed him from the recreation building. *Id.* at ¶¶ 111-12. After this, East Hall Case Manager Riley DeGroot arrived to escort Brakeall back to East Hall. *Id.* at ¶ 113. DeGroot said he could see a lump and bruising on Brakeall's throat where Dominguez had struck him. *Id.* Brakeall told DeGroot that Dominguez assaulted him because Dominguez feared the gangs in East Hall more than he feared the correctional officers, and as a result of the assault, Dominguez would be transferred out of East Hall, away from the gangs, without repercussion. *Id.* at ¶ 114. DeGroot returned Brakeall to East Hall without bringing him to health services, taking statements from witnesses, or taking photos of Brakeall's injuries. *Id.* at ¶¶ 115-16.

That afternoon, Brakeall told Bieber about the assault and asked Bieber to put him on loss-of-recreation shower until the situation "cooled down" because being removed from East Hall would mean Brakeall would receive a major write up. *Id.* at ¶ 117. Bieber refused. *Id.* at ¶ 118. When Brakeall pressed Bieber to protect him, Bieber said he would "look into it." *Id.* Bieber has not spoken to Brakeall since that day. *Id.* at ¶ 119. Brakeall spoke to Allen and Vanderaa about bringing charges against the attackers, but they said that the Division of Criminal Investigation (DCI) would make those decisions, and they did not know anything about it. *Id.* at ¶ 121.

Brakeall told Winters about the assault and asked to be returned to CTP. *Id.* at ¶ 120. In response, on February 12, 2016, Winters delivered a revocation of parole report to Brakeall. *Id.* at ¶ 122. Apparently, Joshua Kaufman, a sex offender treatment provider employed by Dakota Psychological Services, had terminated Brakeall from treatment forty-five days earlier on December 29, 2015. *Id.* Winters said Smith had told her to issue the revocation report. *Id.* According to Brakeall's complaint, there were no allegations that he had violated parole or committed a crime and he had no serious disciplinary infractions while at SDSP; the only things that had happened since Winters told him they were scheduling a polygraph were the assaults. *Id.* at ¶¶ 122-24.

Brakeall alleges that he was under the Board's authority when he was on parole. *Id.* at ¶ 125. He was not an inmate under the authority of the South Dakota Department of Corrections (DOC). *Id.* Brakeall alleges that once his parole was revoked, he became an inmate and the DOC became responsible for his safety and liable for his injuries. *Id.* at ¶ 127. Five days after Brakeall was served with the parole revocation report, he was transferred to West Hall in order to be housed with "lower threat" inmates. *Id.* at ¶ 128.

On April 26, 2016, Brakeall filed this complaint. Docket 1. He alleges that defendants violated his rights under the Fifth, Eighth, and Fourteenth Amendments by attacking him, failing to protect him, failing to investigate the attacks or prosecute the attackers, revoking his parole, housing him in SDSP, terminating him from treatment, and failing to properly staff SDSP. *Id.* at

11

¶¶ 133-38, 140-42. He also claims that defendants failed to follow South Dakota law. *Id.* at ¶ 139. Brakeall requests declaratory and injunctive relief and damages from all defendants. Docket 1.

Brakeall moved to proceed in forma pauperis and provided his prisoner trust account. Docket 3; Docket 4. The court granted his motion provided he pay $100.70 as an initial partial filing fee. Docket 7. On May 23, 2015, Brakeall sent a letter explaining that the prison denied his attempt to use his frozen account to pay his initial partial filing fee. Docket 10. Brakeall now moves the court to order the prison to allow the use of his frozen funds to pay his initial partial fee. Docket 11. On July 18, 2016, Brakeall moved to file a supplemental complaint. Docket 13. In this supplemental complaint, he alleges that Dooley, Young, and Ponto, as well as additional defendants Keith Ditmanson and Angie Steineke violated his rights by not allowing him to use his frozen funds to pay his initial partial filing fee. *Id.*

## DISCUSSION

### I.    Motion Requesting Use of Frozen Funds

Brakeall moves the court to order SDSP to allow him to use his frozen funds to pay his initial partial filing fee. Docket 11. Brakeall alleges that his Unit Manager told him he could not access his frozen savings account for any reason because Brakeall is not serving a life sentence. *Id.* at ¶ 3. Brakeall's complaint does not identify a statute or case that authorizes him to use his frozen funds to make an initial partial filing fee. The court finds no reason to grant Brakeall this relief and denies his motion. *See Klinger v. Dep't of Corr.*,

31 F.3d 727, 732 (8th Cir. 1994) (citing *Turner v. Safley*, 482 U.S. 78, 85 (1987)) ("Because courts have little expertise in the 'inordinately difficult' task of running prisons, courts should accord a high degree of deference to prison authorities").

## II.     Initial Partial Filing Fee

The court previously granted Brakeall leave to proceed in forma pauperis. Now, the court waives his initial partial filing fee. Though a prisoner must normally pay this partial filing fee, Brakeall alleges he is unable to pay. Under 28 U.S. Code § 1915(b)(4), "In no event shall a prisoner be prohibited from bringing a civil action . . . for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." Therefore, the court waives Brakeall's initial partial filing fee.

Under the Prison Litigation Reform Act (PLRA), a prisoner who "brings a civil action or files an appeal in forma pauperis . . . shall be required to pay the full amount of a filing fee." 28 U.S.C. § 1915(b)(1). The waiving of Brakeall's initial partial filing fee does not affect the requirement that he eventually must pay the entire filing fee. Brakeall remains responsible for the entire filing fee, as long as he is a prisoner, even if the case is dismissed at some later time. *See In re Tyler*, 110 F.3d 528, 529-30 (8th Cir. 1997).

Brakeall must "make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account." 28 U.S.C. § 1915(b)(2). The installments will be taken out of his account in installments in the way the SDSP deems appropriate.

13

### III.    Motion to File Supplemental Complaint

Brakeall moves to amend his complaint in order to add claims that defendants Dooley, Young, Ponto, Ditmanson, and Steineke violated his First, Fifth, and Fourteenth Amendment rights by denying him access to the courts. Docket 13 at ¶ 33. "A party may amend its pleading once as a matter of course within . . . 21 days after serving it[.]" Fed. R. Civ. P. 15. Because Brakeall's complaint has not been served, he may amend his complaint as a matter of course. He need not obtain the court's consent. Therefore, his motion is denied as moot, and his supplemental complaint will be screened under § 1915A.

### IV.    Screening Pursuant to § 1915A

Brakeall's complaint raises ten claims under the Fifth, Eighth, and Fourteenth Amendments. Docket 1. Because Brakeall is a prisoner filing under § 1915, the court screens his complaint pursuant to § 1915A. Brakeall fails to state a claim against numerous defendants and the court will analyze this first. The remainder of his claims concern decisions made by defendants concerning his parole, his treatment, and the conditions of the prison.

#### A.    Prisoner Defendants

Brakeall claims that John Doe 1, John Doe 2, John Doe 3, John Doe 4, George Dominguez, and Unknown Inmates violated his rights under the Eighth and Fourteenth Amendment. Docket 1 at ¶¶ 133, 142. He alleges that these defendants assaulted him or conspired to assault him by ordering other inmates to assault him. *Id.*

14

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012) (citing 42 U.S.C. § 1983). Defendant inmates are not "state actors;" they are "private actors." "To be liable under § 1983, a private actor must be . . . 'a willful participant in joint activity with the State' in denying a plaintiff's constitutional rights." *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014) (quoting *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005)). Brakeall does not allege that defendant inmates were connected to the state in any way, only that their assaults were reactions to allegedly poor prison conditions and dangerous policies. Therefore, John Doe 1, John Doe 2, John Doe 3, John Doe 4, George Dominguez, and Unknown Inmates are dismissed as defendants.

**B.     Violations of State Law**

Brakeall claims that Kaemingk, Dooley, Young, Ponto, Bieber, Meirose, Jackson, DeGroot, Vanderaa, Allen, Zoss, and Unknown DOC Employees violated his constitutional rights by "failing to follow the strictures of SDCL 24-2-10[.]" Docket 1 at ¶ 139. " '[A] violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983.' " *Colbert v. Roling*, 233 F. App'x 587, 589-90 (8th Cir. 2007) (quoting *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998). Therefore, this claim is dismissed.

### C.   Unknown Parole Department Employees

Brakeall alleges that Unknown Parole Department Employees violated his constitutional rights. He states that these defendants are "Board of Pardons and Paroles employees . . . ." Docket 1 at ¶ 23. He alleges general issues regarding the conditions of his parole. Members of the parole board are " 'absolutely immune from suit when considering and deciding parole questions.' " *Figg v. Russell*, 433 F.3d 593, 598 (8th Cir. 2006) (quoting *Patterson v. Von Riesen*, 999 F.2d 1235, 1238-39 (8th Cir.1993). To the extent that Brakeall raises claims against members of the Board, his claims are dismissed.

### D.   Defendants Jackson, DeGroot, Vanderaa, and Zoss

Using bare legal conclusions, Brakeall alleges that Lana Jackson, DeGroot, Vanderaa, and Correctional Officer J. Zoss turned a blind eye to the threat against him, Docket 1 at ¶ 138, that she did not properly staff SDSP, *id.* at ¶ 140, and that she failed to preserve evidence of the assaults. *Id.* at ¶ 141. Jackson is named only in one paragraph of the facts section.

Brakeall claims Jackson came to the SHU after he was assaulted and escorted him to health services. *Id.* at ¶ 82. He does not set forth as facts that Jackson made any decisions concerning staffing at SDSP or failed to preserve evidence of the assault. He does not state facts to show that Jackson turned a blind eye to the threats against him. Although Jackson returned Brakeall to East Hall where he was allegedly in danger, he does not state that he ever

16

warned Jackson that he was in danger in East Hall. Therefore, Brakeall fails to state a claim against Jackson, and she is dismissed as a defendant.

With regard to DeGroot, Brakeall alleges that DeGroot returned him to his cell in East Hall after he was assaulted by Dominguez. *Id.* at ¶ 115. DeGroot allegedly said that he could see bruising on Brakeall's throat, *id.* at ¶ 113, and Brakeall explained to DeGroot why Dominguez attacked him. *Id.* at ¶ 114. Brakeall does not allege as facts that DeGroot made any decisions concerning staffing at SDSP or that DeGroot failed to preserve evidence of the assault. He does not state facts to show that DeGroot turned a blind eye to the threats against him. Although DeGroot returned Brakeall to East Hall where he was allegedly in danger, Brakeall was not assaulted after the Dominguez assault. Once DeGroot was on notice that Brakeall was in danger, Brakeall was not assaulted again. Therefore, Brakeall fails to state a claim against DeGroot, and he is dismissed as a defendant.

With regard to Vanderaa, Brakeall alleges that after he was assaulted in the recreation building, Vanderaa escorted him to the SHU and stated that Brakeall's attackers would be charged, pictures of Brakeall's injuries would be taken, and witness statements would be taken. *Id.* at ¶¶ 74-75. Brakeall alleges that Vanderaa put him in the SHU holding cell. *Id.* at ¶ 79. Later, Brakeall allegedly asked Vanderaa about the investigation into the assault, and Vanderaa told Brakeall that he did not know about the investigation and that it would be handled by DCI. *Id.* at ¶ 121. Brakeall does not set forth facts to show that Vanderaa made any decisions concerning staffing at SDSP or

failed to preserve evidence of the assault. He does not state facts to show that
Vanderaa turned a blind eye to the threats against him. Therefore, Brakeall
fails to state a claim against Vanderaa, and he is dismissed as a defendant.

With regard to Correctional Officer J. Zoss, Brakeall alleges that Zoss
forced him to eat lunch alone because he was bleeding from the card room
assault and that Zoss brought him to the emergency room later that day. *Id.*
at ¶¶ 85, 86. Brakeall does not set forth any facts to show that Zoss made any
decisions concerning staffing at SDSP or failed to preserve evidence of the
assault. He does not state facts to show that Zoss turned a blind eye to the
threats against him. Therefore, Brakeall fails to state a claim against Zoss,
and she is dismissed as a defendant.

### E.    Prison Condition Claims

Brakeall raises four remaining claims concerning the prison staff and
conditions at the prison. He claims that Kaemingk, Dooley, Young, Ponto,
Bieber, Meirose, Allen, and Unknown DOC Employees violated his rights
under the Fifth, Eighth, and Fourteenth Amendments by their deliberate
indifference to threats against his safety, *id.* at ¶ 138, their failure to properly
staff the prison, *id.* at ¶ 140, and their failure to preserve evidence of prison
assaults and curb prison violence. *Id.* at ¶ 141. He also claims that Dooley,
Young, Ponto, Ditmanson, and Steineke violated his right to access the courts
by denying him access to the funds in his frozen account in order to pay the
initial partial filing fee. Docket 13.

18

### 1.    Failure to Protect

"Because being subjected to violent assault is not 'part of the penalty that criminal offenders [must] pay for their offenses,' '[t]he Eighth Amendment imposes a duty on the part of prison officials to protect prisoners from violence at the hands of other prisoners." *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998)).

> In order to establish an Eighth Amendment failure-to-protect claim, a plaintiff must show that the prison official was deliberately indifferent to a 'substantial risk of serious harm. In doing so, a prisoner must satisfy two requirements. . . . The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious; i.e., whether the inmate is incarcerated under conditions posing a substantial risk of serious harm. The second requirement is subjective and requires that the inmate prove that the prison official had a sufficiently culpable state of mind. In prison conditions claims, . . . the subjective inquiry regarding an official's state of mind is one of deliberate indifference to inmate health or safety. An official is deliberately indifferent if he or she actually knows of a substantial risk and fails to respond reasonably.

*Walls v. Tadman*, 762 F.3d 778, 782 (8th Cir. 2014) (quoting *Whitson*, 602 F.3d at 923) (internal citations and quotations omitted).

Brakeall has alleged that the risk of harm was sufficiently serious. From the first day he was incarcerated, he was threatened by other inmates, including his cellmate. Docket 1 at ¶¶ 29, 30. He was continuously threatened with violence by other prisoners whenever he was incarcerated in JPA or East Hall. *Id.* at ¶¶ 45, 53-54, 100. He was also assaulted three times. *Id.* at ¶¶ 37, 61, 108. The preceding assaults showed that the risk of harm was very

19

serious. The second assault, in particular, was brutal, even necessitating a visit to the emergency room. *Id.* at ¶ 86.

Brakeall has sufficiently alleged that defendants were deliberately indifferent to his safety. First, he has alleged that defendants knew of the risk. Brakeall warned staff as much as he could. He warned the admitting officer the day he arrived at SDSP. *Id.* at ¶ 28. He warned prison staff before the first assault, *id.* at ¶¶ 31, 34, including Meirose. *Id.* at ¶¶ 35-36. He warned other prison staff before the other assaults, *id.* at ¶¶ 45, 52, 57, 58, 103, 105, including Bieber, *id.* at ¶¶ 52, 56, 117, 118, and Allen. *Id.* at ¶ 106.

Second, he has alleged that defendants failed to respond reasonably. He alleges that, in regards to his safety, defendants failed to respond at all. After all the threats, warnings, and assaults, nothing was allegedly done to ensure Brakeall's safety. *Id.* at ¶¶ 38, 105.

Brakeall alleges that he warned Meirose, Bieber, Allen, and Unknown DOC Employees that he was in danger, but nothing was done. He does not allege that Kaemingk, Dooley, Young, or Ponto knew of the danger he was in. Therefore, this claim is dismissed as it concerns Kaemingk, Dooley, Young, and Ponto for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). The claim survives screening as it relates to Meirose, Bieber, Allen, and Unknown DOC Employees.

### 2.   Staffing

Brakeall claims that Kaemingk, Dooley, Young, Ponto, Bieber, Meirose, Allen, and Unknown DOC Employees violated his rights under the Fifth,

Eighth, and Fourteenth Amendments by failing to properly staff SDSP. Docket 1 at ¶ 140. He alleges that this puts all inmates at a greater risk of harm, a harm to which defendants are deliberately indifferent. *Id.* Brakeall's claims are analyzed under the deliberate indifference test explained above.

Brakeall fails to state a claim that the prison was understaffed against Bieber, Meirose, and Allen. According to Brakeall's complaint, these defendants are not in positions at SDSP to make staffing decisions. *Id.* at ¶¶ 6, 7, 11. Therefore, staffing claims against these defendants are dismissed.

" 'A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.' " *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005) (quoting *Farmer*, 511 U.S. at 844–45). In *Crow*, the Eighth Circuit reversed the district court's order denying summary judgment on claims by a detainee "that the facility was overcrowded, poorly supervised and understaffed and that the detainees were inadequately classified." *Id.* The Eighth Circuit found the allegations insufficient to show deliberate indifference. *Id.* At most, the allegations showed that prison officials "may have acted unreasonably in failing to take particular measures to improve the conditions at the facility," and this "negligence standard" did not "give rise to an Eighth Amendment failure-to-protect claim." *Id.* (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)).

21

Brakeall fails to state a claim against Kaemingk, Dooley, Young, and Ponto. Though his factual allegations (the multiple assaults) support his claim, he does not mention any action or inaction by these defendants concerning staffing or general dangerousness of the prison. It is common sense that these defendants make staffing decisions, but without specific allegations, the court cannot determine whether defendants' actions or inactions give rise to an Eighth Amendment claim based on inadequate staffing. Therefore, Brakeall's claim concerning staffing at SDSP is dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3.   Investigation of Assaults

Brakeall claims that Kaemingk, Dooley, Young, Ponto, Bieber, Meirose, Allen, and Unknown DOC Employees violated his rights under the Fifth, Eighth, and Fourteenth Amendments by failing to preserve evidence of his assaults. Docket 1 at ¶ 140. Brakeall alleges that this failure made it impossible to investigate the assaults. *Id.* Brakeall also alleges that this lack of punishment causes violence to spread in SDSP because prisoners, including those who attacked Brakeall, may commit acts of violence without fear of action from prison officials. *Id.*

The court construes Brakeall's claim as a claim that defendants failed to investigate the assaults. In *Clemmons v. Armontrout*, 477 F.3d 962 (8th Cir. 2007), the Eighth Circuit dealt with an inmate's claim that prison officials failed to investigate a prison crime. Clemmons, an inmate, sued Brooks, the

prison investigator, for failing "to disclose or investigate exculpatory leads or exonerating information deprived Clemmons of his liberty interest in a fair trial." *Id.* at 963. Another inmate at the prison was stabbed to death, and Clemmons was investigated by Brooks. *Id.* at 963-64. Clemmons was eventually tried and found guilty. *Id.* at 964. Clemmons claimed Brooks did not investigate or give to the prosecutor numerous pieces of evidence that he did not commit the murder, and he was eventually granted habeas based on these facts. *Id.* at 965. The Eighth Circuit reversed the district court's denial of qualified immunity as to Brooks. *Id.* at 963.

The Eighth Circuit compared Brooks to police officers rather than prosecutors, stating the law " 'has never imposed th[e] absolute duty [to produce all materially favorable evidence] on law enforcement officials other than the prosecutor[,]' and it 'would be impermissible to hold the police liable for due process violations under § 1983 where they have acted in good faith.' " *Id.* at 966 *Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir. 2004); *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000). "Likewise, '[n]egligent failure to investigate other leads or suspects does not violate due process.' " *Id.* (quoting *Wilson v. Lawrence Cty., Mo.*, 260 F.3d 946, 955 (8th Cir.2001).

The Eighth Circuit found that Brooks did not violate Clemmons' constitutional rights. Clemmons had "adduced no evidence that Brooks acted intentionally, recklessly, or in bad faith" when he failed to disclose information to the prosecutor and failed to fully investigate that information. *Id.* Clemmons' evidence that Brooks failed to investigate was not enough because

he "offered no explanation for why [Brooks'] actions constitute recklessness as opposed to mere negligence." *Id.*

Under *Clemmons*, Brakeall fails to state a claim. He does not allege that defendants "intentionally, recklessly, or in bad faith" failed to investigate the assaults. Brakeall alleges that defendants failed to take pictures of his wounds or take statements after the assaults. Docket 1 at ¶¶ 40, 73, 75, 84, 99, 116. He states that DOC policy and practice is to take photos and statements after an attack. *Id.* at ¶¶ 41, 129, 130. Vanderaa allegedly said this would be done after the assault in the recreation building. *Id.* at ¶ 74. When Brakeall later asked defendants Vanderaa and Allen about charges and an investigation, they said it would be handled by the DCI. *Id.* at ¶ 121. Brakeall says he has never spoken to DOC security or the DCI about the assaults. *Id.* at ¶ 130. These allegations, however, do not show that defendants "intentionally, recklessly, or in bad faith" failed to investigate the assaults. Therefore, Brakeall fails to state a claim concerning defendants' failure to preserve evidence, and his claim is dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). While the court finds this allegation does not independently state a claim, the court notes that evidence of a failure to properly investigate the alleged assaults may be admissible with regard to the failure to protect claim.

### 4.    Use of Frozen Funds

In his supplemental complaint, Brakeall alleges that Dooley, Young, Ponto, Ditmanson, and Steineke violated his First, Fifth, and Fourteenth

24

Amendment rights by "withholding" the funds in his frozen account, making him unable to pay his initial partial filing fee and therefore denying him access to the courts. Docket 13. As discussed above, however, the court has waived Brakeall's initial partial filing fee and screened his complaint. Brakeall has not been denied access to this court. Therefore, he fails to state a claim of access to the courts and his claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### F.    Parole Claims

Brakeall raises two claims concerning his parole. He claims that defendants Smith, Winters, Ripperda, Kaufman, Unknown Department of Parole Employees, and Unknown Sex Offender Management Panel violated his rights under the Fifth, Eighth, and Fourteenth Amendments by causing him to be housed in JPA and SDSP while on parole and thereby being deliberately indifferent to threats to his safety. Docket 1 at 134. He also claims that defendants Smith, Winters, Kaufman, Unknown Department of Parole Employees, and Unknown Sex Offender Management Panel Employees violated his rights under the Fifth, Eighth, and Fourteenth Amendments by revoking his parole after he was assaulted in order to avoid liability for his safety.

### 1.    Deliberate Indifference

Brakeall claims that Smith, Winters, Ripperda, Kaufman, Unknown Department of Parole Employees, and Unknown Sex Offender Management Panel were deliberately indifferent to the threat to his safety by housing him in

25

prison while he was on parole. *Id.* at ¶ 134. A plaintiff seeking speedier release must use habeas remedies. *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005). But, "conditions of confinement including the issue of a less restrictive custodial setting may be addressed in a civil rights action." *Brand v. Gibson*, No. 4:05CV3194, 2006 WL 2009110, at *2 (D. Neb. July 17, 2006); see also *Shannon v. Roy*, No. CIV. 11-3262 JRT/FLN, 2012 WL 3779145, at *5 (D. Minn. Aug. 15, 2012), report and recommendation adopted, No. CIV. 11-3262 JRT/FLN, 2012 WL 3779212 (D. Minn. Aug. 31, 2012).

Brakeall argues that defendants were deliberately indifferent by housing him in the maximum/high medium security facilities of JPA and SDSP while he was on parole. But, this never happened according to the facts alleged in the complaint. His arrest warrant was allegedly dropped on December 14, 2012, and two days later he was transferred out of JPA to CTP. Docket 1 at ¶ 42. When he was arrested again and his parole was revoked, he was transferred back to JPA. *Id.* at ¶¶ 44-45. After Brakeall was put back on parole, he was again transferred to CTP. *Id.* at ¶¶ 46-47. When he was arrested for failing a polygraph test, *id.* at ¶ 51, he was transferred to JPA and then to East Hall. *Id.* at ¶¶ 51-52. Defendants never "caus[ed] him to be housed in maximum/high medium security facilities at JPA and SDSP while on parole[.]" *Id.* at ¶ 134.

Also, the argument that these defendants were deliberately indifferent and therefore responsible for his assaults is too attenuated. The parole defendants did not have any control over the conditions of the prison. Even

26

though some of these defendants were told Brakeall was in danger, they could do nothing about the conditions of prison or the conditions that caused the danger. These defendants cannot avoid incarcerating parole violators because prison is a generally dangerous place. Further, Brakeall has the ability to sue for his injuries, because he can and has raised claims against prison officials who are proper defendants in prison condition claims.

He does not raise a claim about his time in CTP, but in the fact section of his complaint, he complains that he was not given enough freedom while on parole in CTP. *E.g. id.* at ¶ 42. This cannot be the basis of a deliberate indifference claim. Not only does Brakeall not claim he was in danger in CTP, but he was never attacked while housed there. Therefore, to the extent that Brakeall raises a deliberate indifference claim based on his time in CTP, it is dismissed.

### 2.     Parole Revocation

Brakeall claims that Smith, Winters, Kaufman, Unknown Department of Parole Employees, and Unknown Sex Offender Management Panel Employees violated his rights under the Fifth, Eighth, and Fourteenth Amendment by revoking his parole so that they would not be liable for Brakeall's injuries or responsible for his safety. *Id.* at ¶ 135. Brakeall claims no injury distinct from his parole revocation. The only complaint he raises is that parole was revoked and the reasoning he ascribes for this choice. He does not challenge the process or procedures used to arrive at the decision. Therefore, he must raise

this claim in a habeas petition. *See Wilkinson*, 544 U.S. at 81 (plaintiff seeking speedier release must use only habeas remedies).

### G.    Treatment Claims

Brakeall raises two claims concerning the treatment that was a requirement of his parole. He claims that Kaufman violated his rights under the Fifth and Fourteenth Amendments by terminating Brakeall from treatment. *Id.* at ¶ 136. He also claims that Kaufman and Unknown Sex Offender Management Panel Employees violated his rights under the Fifth, Eighth, and Fourteenth Amendments by classifying him as a "high risk" parolee and recommending administrative detainers knowing he would be housed in JPA and SDSP. *Id.* at ¶ 137.

### 1.    Termination of Treatment

Brakeall claims that Kaufman violated his rights by terminating him from treatment without due process. *Id.* at ¶ 136. He alleges that he had no way to contest this decision. *Id.* Finally, he alleges that this decision had a direct effect on his parole status. *Id.* It is not clear that Kaufman is a state actor, capable of being sued under § 1983. The court will accept Brakeall's allegation that he is for purposes of § 1915A screening. *Id.* at ¶ 16.

To prevail on § 1983 due process claims, a plaintiff "must establish that he was deprived of a protected liberty interest." *Persechini v. Callaway*, 651 F.3d 802, 806 (8th Cir. 2011) (citing *Sandin v. Conner*, 515 U.S. 472 (1995). " 'Protected liberty interests may arise from two sources—the Due Process

Clause itself and the laws of the States.' " *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

*Persechini* concerns a prisoner who, after being found guilty of violating a prison rule, was terminated from a substance abuse program. *Id.* at 804. Had he completed the program, he would have been eligible for probation, but after the termination his original sentence was mandatorily executed. *Id.* In *Persechini*, the court pointed out that Persechini "was subject to a preexisting judicial sentence of fifteen years in prison." *Id.* Therefore, the "program termination did not confer a liberty interest because it 'mean[t] only that [Persechini] will serve the remainder of his original sentence under typical circumstances.' " *Id.* at 808 (quoting *Richardson v. Joslin*, 501 F.3d 415, 419-20 (5th Cir. 2007)). Here, the termination of Brakeall's treatment and the subsequent parole revocation only caused him to continue to serve his preexisting sentence.

Even if Brakeall argues that the consequences of Kaufman's decision constituted more than a change in the conditions of his confinement, "[t]he general rule . . .  is that '[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed.' " *Id.* at 807 (quoting *Sandin*, 515 U.S. at 480). Therefore, he fails to state a due process claim under the Due Process Clause.

The inquiry into whether the state has created a liberty interest "turns on whether the challenged conditions impose 'atypical or significant hardship ... in relation to the ordinary incidents of prison life.' " *Id.* at 806 (quoting

29

Sandin, 515 U.S. at 484). Persechini claimed that "he had a plausible liberty interest in avoiding the "atypical and significant hardship" of termination from the long-term substance-abuse treatment program." *Id.* at 807. The Eighth Circuit disagreed. *Id.*  The court found:

> [D]enying or terminating drug abuse treatment, like denial or termination of other discretionary prison programs, does not result in either an atypical or a significant hardship in relation to the remainder of the prison population. Thus, there is no protected liberty interest, for example, in the sentence reduction that may be granted upon completing a Bureau of Prisons drug treatment program . . . or in participating in Missouri's sex offender treatment program.

*Id.* at 807 (citations omitted).

This analysis applies to Brakeall's argument. Terminating Brakeall from treatment did not result "in either an atypical or a significant hardship in relation to the remainder of the prison population" but only changed the condition of his confinement from the less restrictive CTP to the more restrictive incarceration in JPA. Therefore, Brakeall fails to state a claim that Kaufman's termination violated his constitutional rights.

### 2.      Classification and Recommendations

Brakeall raises two related claims that Kaufman and Unknown Sex Offender Management Panel Employees violated his rights under the Fifth, Eighth, and Fourteenth Amendments. Docket 1 at ¶ 137. He challenges his classification as a "high risk parolee" and the decision to recommend Brakeall be placed on an administrative detainer. *Id.*

### a.   "High Risk" Classification

Brakeall claims Kaufman and Unknown Sex Offender Management Panel Employees violated his rights by declaring him a "high risk parolee" based on the fact that he failed a polygraph test. *Id.* He claims there was no evidence or allegations that he had committed a crime. *Id.* Finally, he claims that he had no mechanism to appeal these decisions. *Id.*

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court held that the conditions of a maximum security facility were so onerous that classification that led to incarceration in this facility established a liberty interest under the Due Process Clause. The Eighth Circuit has suggested that being confined in maximum security conditions for an indefinite period of time may result in an atypical and significant hardship, giving rise to a liberty interest. *See Portley-El v. Brill*, 288 F.3d 1063, 1065-66 (8th Cir. 2002). In general, however, prisoners do "not have a constitutional right to a particular prison ... classification." *Sanders v. Norris*, 153 Fed. App'x. 403, 404 (8th Cir. 2005). "[C]onstitutionally speaking, assignments are discretionary, so long as they are not done for prohibited or invidious reasons and do not rise to independent constitutional violations on their own weight." *Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996).

Brakeall does not claim that his classification as a "high risk parolee" was indefinite. In fact, he bounced back and forth between CTP and JPA. He also does not claim defendants classified him as such for an invidious reason, but based on an "inadmissible monitor polygraph . . . ." Docket 1 at ¶ 137. He

31

claims that he was housed in JPA, with onerous conditions, as a result of this classification. But, as discussed above, he was not in JPA while on parole. Therefore, his claim is dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### b.    Recommendations

Brakeall claims that Kaufman and Unknown Sex Offender Management Panel Employees violated his rights by recommending he be placed on administrative detainers. Docket 1 at ¶ 137. Brakeall argues that this decision constituted deliberate indifference to his safety because it meant he would be placed in JPA. *Id.* This claim is dismissed for the same reasons Brakeall's deliberate indifference claim against the parole defendants are dismissed.

His claim that Kaufman and Unknown Sex Offender Management Panel Employees were deliberately indifferent because they placed him under administrative detainers is too attenuated. These defendants do not have control over the prison and are not responsible for the general fact that prison is not completely safe. Therefore, his claim is dismissed.

### CONCLUSION

Brakeall states a claim that defendants Meirose, Bieber, Allen, and Unknown DOC Employees violated his rights under the Eighth Amendment by failing to protect him. This claim survives screening. All of Brakeall's other claims are dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Accordingly, it is ORDERED

1.   Brakeall's motion requesting an order to allow him to pay the filing fee from his frozen account (Docket 11) is denied.

2.   Brakeall's initial partial filing fee is waived.

3.   Brakeall's institution will collect the monthly payments in the manner set forth in 28 U.S.C. § 1915(b)(2) and this court's order (Docket 7) and will forward those installments to the court until the $350 filing fee is paid in full.

4.   The clerk of the court is directed to send a copy of this order to the appropriate official at Brakeall's institution.

5.   Brakeall's motion for leave to file a supplemental complaint (Docket 13) is denied as moot.

6.   Brakeall fails to state a claim against John Doe 1, John Doe 2, John Doe 3, John Doe 4, George Dominguez, Unknown Inmates, Jackson, DeGroot, Vanderaa, Zoss, Kaufman, Smith, Winters, Ripperda, Kaemingk, Dooley, Ponto, Young, Ditmanson, Steineke, Unknown Sex Offender Management Panel Employees, and Unknown Parole Department Employees. These defendants are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

7.   Brakeall's Eighth Amendment failure to protect claim against Bieber, Meirose, Allen, and Unknown DOC Employees survives screening under 28 U.S.C. § 1915A.

8.   The Clerk shall send blank summons forms to Brakeall so he may cause the summons and complaint to be served upon defendants.

9.    The United States Marshal shall serve a copy of the complaint (Docket 1), summons, and this order upon defendants Meirose, Bieber, Allen, and Unknown DOC Employees as directed by Brakeall. All costs of service shall be advanced by the United States.

10.   Defendants will serve and file an answer or responsive pleading to the remaining claims in the complaint on or before 21 days following the date of service.

11.   Brakeall will serve upon defendants, or, if appearance has been entered by counsel, upon their counsel, a copy of every further pleading or other document submitted for consideration by the court. He will include with the original paper to be filed with the clerk of court a certificate stating the date and that a true and correct copy of any document was mailed to defendants or their counsel.

12.   Brakeall will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

Dated July 26, 2016.

                              BY THE COURT:
                              /s/ *Karen E. Schreier*
                              KAREN E. SCHREIER
                              UNITED STATES DISTRICT JUDGE