## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

Winston Grey Brakeall,
    Plaintiff,

File No.: 04:16-CV-04057

v.

Dennis Kaemingk, Robert Dooley, Darin

Young, Troy Ponto, Derrick Bieber, Tim

Meirose, Lana Jackson, Riley DeGroot,

Ryan Vanderaa, William Allen, J. Zoss,

Unknown Department of Corrections

Employees, Aileen Winters,
    Defendants.

**AMENDED AND VERIFIED**

**CIVIL RIGHTS COMPLAINT**

WINSTON GREY BRAKEALL deposes and states the following:

### INTRODUCTION

This is a verified civil rights complaint brought by the Plaintiff, Winston Grey Brakeall,

pursuant to 42 U.S.C. § 1983 to address the deprivation of constitutional rights as provided by

the United States Constitution's Bill of Rights and Constitutional Amendment Fourteen.

$Amended$

### JURISDICTION

This Court has jurisdiction over Plaintiff's claims of ongoing Constitutional violations

pursuant to 28 U.S.C. §1331(1) and 1343.

$Amended$

### PARTIES

1.    Plaintiff, Winston Grey Brakeall, was a parolee under the care and supervision of the Board of Pardons and Paroles. At all times referenced herein, Plaintiff was housed in the custody of the South Dakota Department of Corrections ("SDDOC") at the Jameson Prison Annex ("JPA"), the South Dakota State Penitentiary ("SDSP"), or the Unit C Trustee facility in the Community Transition Program ("CTP") in Sioux Falls, South Dakota.

2.    Defendant, Dennis Kaemingk, is the Secretary of Corrections for the State of South Dakota.

3.    Defendant, Robert Dooley, is the Chief Warden for the South Dakota Department of Corrections.

4.    Defendant, Darin Young, is the Warden at SDSP.

5.    Defendant, Troy Ponto, is an Associate Warden at SDSP.

6.    Defendant, Derrick Bieber, is a Unit Manager at SDSP

7.    Defendant, Tim Meirose, is a Unit Manager at SDSP.

8.    Defendant, Lana Jackson, is a Case Manager at SDSP.

9.    Defendant, Riley DeGroot, is a Case Manager at SDSP.

10.   Defendant, Ryan Vanderaa, is a Correctional Officer with the rank of Lieutenant at SDSP.

11.   Defendant, William Allen, is a Correctional Officer with the rank of Corporal at SDSP.

12.   Defendant, J. Zoss, is a Correctional Officer at SDSP.

13.   Defendant, Unknown Department of Corrections Employees, are SDDOC employees employed at SDSP, JPA, and/or Unit C in Sioux Falls, South Dakota.

14.   Defendant, Aileen Winters, is a parole agent employed in the Sioux Falls Parole Office.

15. This Plaintiff brings this suit against all of the known and unknown Defendants in both *remains, Was 26* their individual and official capacities.

## FACTS OF COMPLAINT

16. While living with his parents on an interstate parole compact in Illinois, Plaintiff, *remains, was 27* Winston Grey Brakeall, was taken into custody on November 4, 2014, pursuant to a warrant issued by the South Dakota Board of Pardons and Paroles.

17. On December 11, 2014, Plaintiff was informed by JPA staff that he was being transferred to general population at SDSP to await his parole revocation hearing. *AMENDED Was 34*

18. Plaintiff saw that East Hall was his destination and informed the transport officers, including CO Zoss, that he would be at risk in East Hall. *AMENDED WAS 34*

19. Plaintiff was told to talk to staff when he arrived or go to the Special Housing Unit ("SHU") with a major write-up for refusing the transfer. Fear of losing parole forced Plaintiff to accept the transfer. *AMENDED WAS 34*

20. Upon reaching East Hall, Plaintiff was assigned a cell on tier North 3. Plaintiff immediately notified the officers that he would be in danger. Plaintiff was allowed to speak to Unit Manager ("UM") Tim Meirose. *AMENDED, WAS 35*

21. Plaintiff spoke to UM Meirose in his office and informed him that he would be at risk in East Hall in general population. *AMENDED Was 36*

22. UM Meirose told Plaintiff that no other cells were available and presented him with the options of accepting that cell or going to the SHU for refusing housing— a major rule violation, which would, by itself, be cause for revocation of parole. *AMENDED WAS 36*

23. With great hesitation, Plaintiff accepted the cell assignment and was subsequently assaulted in the SDSP dining hall less than 48 hours later, on December 13, 2014. *remains was 37*

3

24. After the assault, while being evaluated in health services for the bruises and "goose eggs" across his head and neck, Plaintiff was given the choices of returning to his assigned cell, accepting a parole-ending write-up for refusing housing, or requesting protective custody, which the lieutenant noted, "gives you kind of a reputation as a punk," given that there is no true protective custody in SDDOC, only transfers between housing units. *AMENDED was 38*

25. The lieutenant then went to speak to the assailant and was apparently told how severe the threat Plaintiff faced from the gangs running East Hall actually was. *Amended was 39*

26. Plaintiff was moved to the West Hall unit for his protection. *AMENDED was 39*

27. No photographs of Plaintiff's injuries were taken and no statement was recorded. SDDOC policy requires the generation of an incident report, which will identify both the assailant and the officers involved. *A MENDED was 40-41*

28. In April 2015, Plaintiff was arrested and placed on a 90 day administrative detainer for failing monitor polygraphs without any evidence or allegations of criminal activity. *AMENDED WAS 44*

29. For most of April 2015, Plaintiff was held in population in JPA, during which time he was threatened and his property stolen (stamps, shampoo, shower shoes). Plaintiff kept JPA staff appraised of the threats he received and the thefts. No action was taken. *REMAINS, Was 45*

30. While participating in the CTP program, Plaintiff was arrested at Unit C and placed on a second administrative detainer on December 1, 2015 for failing a monitor polygraph, again without any evidence or allegations of criminal activity. He was placed in general population in JPA. *AMENDED Was 51*

31. On December 2, 2015, Plaintiff was transferred to SDSP and assigned cell 1 in East Hall. *AMENDED WAS 52*

4

32. Plaintiff spoke to several officers on duty that morning and unit staff, including UM Derrick Bieber, about the prior year's assault and was given the same two options of accepting the assigned cell or going to the SHU with a major write-up for refusing housing and effectively surrendering his parole. With his parole at stake, Plaintiff felt forced to accept the cell assignment.

AMENDED WAS 52

33. On December 14, 2015, Parole Agent Aileen Winters came to Plaintiff's cell to serve him with an administrative detainer report. Refusing to sign the form is a request for an immediate revocation of parole hearing. At that time, Mrs. Winters told Plaintiff that the plan she and her supervisor, J.C. Smith, had was that Plaintiff would stay at SDSP for 90 days and take another polygraph. If he passed the polygraph, he would go back to parole at Unit C. There was no evidence of allegations of criminal activity.

AMENDED WAS 53

34. Plaintiff informed Mrs. Winters that he had previously been assaulted in East Hall and had been threatened. She told him to speak to unit staff.

NEW

35. When Plaintiff informed her that he had already spoken to staff, she shrugged and said something to the effect of, "I guess you'll have to figure it out."

NEW

36. In January 2016, David Lykken and another inmate, who wishes to remain unidentified to avoid reprisals, informed Plaintiff that they had been warned away from associating with Plaintiff and told him that gang members intended to either assault Plaintiff or extort protection money from him.

AMENDED WAS 54

37. One of the inmates described the situation as, "You're a big fat guy on a sex charge who can't fight back because you want to keep your parole, so these guys can make their bones by jumping you without any risk." Plaintiff is 6'9" and 330 lbs.

REMAINS WAS 55

5

38. Plaintiff informed UM Bieber of the specific threats and Mr. Bieber told him he would "look into it." Nothing was done. AMENDED was 56

39. Plaintiff reported the threats to officers working in East Hall and was told that without providing names, nothing could be done to protect him without writing him up for refusing housing. AMENDED was 57

40. On approximately January 28, 2016, Plaintiff spoke to Parole Agent Winters when she came to prison to see another detainee. At that time, Agent Winters stated that she was waiting for her supervisor to decide when Plaintiff would take another polygraph and be released to parole. Plaintiff informed her that there were urgent, more specific threats against his safety and she again told him to report them to staff. AMENDED was 58

41. On February 1, 2016, Plaintiff was in the SDSP recreation building. The recreation building covers roughly 1.5 acres, similar to a medium sized grocery store. There are six areas: the basketball/volleyball courts, weight room, music room, craft room, card room, and the hallway used as a walking track. Approximately 150-200 maximum/high medium security inmates and paroles were at rec (standard for a morning rec period). There were three officers on duty: one stationed in the weight room, one at the entrance, and one in the control pod. REMAINS was 59

42. After completing a phone call, Plaintiff went into the card room and sat at a table with inmate David Lykken. REMAINS was 60

43. As soon as he was seated, Plaintiff was struck from behind across the face, sending blood and his glasses flying. After several rapid blows, Plaintiff was forced to the floor and covered his face with his hands, expecting SDDOC officers to intervene. REMAINS was 61

44. There were no officers in the card room and the beating continued for at least one minute. REMAINS WAS 62

6

45. Plaintiff was later told by other inmates, including David Lykken, that three inmates participated in the vicious assault, taking turns punching and kicking Plaintiff in the head, back, and upper torso.

*AMENDED Was 63*

46. Plaintiff was also told by inmate Lykken that one of the assailants had been playing cards at a different table and when Plaintiff sat down with Mr. Lykken, the card player stood up and another inmate took his seat at the card game to convey the impression to a casual observer that no one had moved.

*AMENDED was 64*

47. Once the assailants left of their own accord, Plaintiff stood with difficulty. Inmate Lykken described his fear, based on Plaintiff's appearance and the violence of the attack, that Plaintiff's blood and matted hair covered a depressed skull fracture.

*REMAINS was 67*

48. Injuries Plaintiff suffered during this attack include: a deep trauma nose bleed; right temple laceration; left temple abrasions; extensive bruising and swelling of the left ear; extensive bruising to both forearms; abrasions on his right elbow; multiple "goose eggs," pain and swelling at impact points across both temples, across the back and crown of his skull, at the base of the skull where the spine enters; muscular trauma to the neck, jaw, and torso; and bruising which reached Plaintiff's lower back.

*AMENDED Was 71*

49. Plaintiff recovered his broken glasses, bleeding heavily from his nose and scalp lacerations.

*REMAINS was 68*

50. There were still no correctional officers or staff present.

*REMAINS WAS 69*

51. Inmate Lykken stated that he was watched for the rest of the rec period by the gang members and assailants to ensure that he did not help the Plaintiff or provide any information to staff about the assault. He was later threatened in the cell hall to ensure his ongoing silence. Inmate Lykken is willing to provide a statement in support, but has not

*AMENDED WAS 70*

7

been allowed access to the SDSP law library computers by prison staff in several months and, due to Plaintiff's transfer, is no longer allowed to contact Plaintiff.

52. Inmates later reported to Plaintiff that rumors among staff members alleged that the rec building control room officer responsible for monitoring the video feeds was playing games on her phone at the time. Unenforced SDDOC policy forbids officers the use of personal phones inside the prison.

AMENDED WAS 65

53. Inmates including David Waff and David Lykken also reported to Plaintiff that the SDSP was operating with at least nine officers less than the schedule required for the day, but staffing shortages are ignored.

AMENDED WAS 66

54. After the savage gang attack, Plaintiff proceeded to the only visible correctional officer, posted at the exit gate, and indicated the blood pouring out of his nose, informing the officer that there had been an assault.

AMENDED WAS 72

55. Plaintiff was instructed to wait at the gate until an officer could be sent down from the cell hall to escort him to health services. He remained at the gate, bleeding heavily, for several minutes until Lt. Ryan Vanderaa arrived.

AMENDED WAS 73

56. According to inmate Lykken, nothing was done in the card room to secure evidence or photograph the scene. A rec building officer sent an inmate worker in with a mop to clean up all the blood.

NEW

57. In the tunnel from the rec building, Plaintiff informed the escorting officer, Lt. Ryan Vanderaa, that he wanted his assailants charged with felony assault, not just a disciplinary report, because Plaintiff was a parolee on administrative detainer, not an inmate. Lt. Vanderaa stated that the assailants would be charged and pictures of Plaintiff's wounds and a full statement would be taken by Security.

AMENDED WAS 74

8

58. Health service staff bandaged Plaintiff's right temple scalp laceration and left temple *AMENDED WAS 75* abrasion and the nose bleed seemed to stop. Plaintiff complained of dizziness, nearly falling several times, and was given Ibuprofen.

59. No photos or statement were taken. *AMENDED WAS 75*

60. At this point, Plaintiff was informed that he was being taken to the SHU for investigative *REMAINS WAS 76* purposes and was handcuffed behind his back. When he complained that he was the victim, Lt. Vanderaa stated that he had to be handcuffed to be taken to the SHU per policy.

61. In the SHU entry holding cell, Lt. Vanderaa began changing Plaintiff into SHU clothing, *REMAINS, WAS 77* until he received word on the radio that the three assailants were being brought to the SHU.

62. Plaintiff, still in bloodied general population attire, was recuffed and taken to the SHU *REMAINS, WAS 78* main gate.

63. Upon reaching the SHU, Lt. Vanderaa was told the unit was full and Plaintiff was placed *REMAINS, WAS 79* in a three foot square holding cell with his handcuffs secured to the bench behind his back.

64. Shortly thereafter, both the Plaintiff's nose bleed and scalp laceration resumed bleeding. *AMENDED WAS 80* While dribbling blood across his shirt, pants, onto the floor, and down the door, Plaintiff informed two officers during two rounds, by SDDOC policy fifteen minutes apart, that he was bleeding heavily. Because Plaintiff's glasses were shattered during the assault, he was unable to identify these officers. Trying to avoid confrontation with the officers, Plaintiff informed them that he was bleeding heavily and stated, "All I need is a free hand

9

and a towel." One of the officers responded with something like, "I'll see what we can *Remains was*
do," and left the unit. The other officer did not respond at all.

65. During this period, an officer came to speak to the inmate in cell ten. He also ignored *Remains was 81*
Plaintiff's request for medical attention.

66. SHU Case Manager Lana Jackson came to the holding cell after approximately forty *Amended was 82*
minutes and informed Plaintiff that being sent to the SHU was a mistake and she was
going to return him to his cell in East Hall

67. Once she saw the pool of blood on the floor, she escorted him to health services. Plaintiff *Amended, was 82*
asked her about seeing Special Security and providing a statement to press charges
against the assailants. Ms. Jackson said that wasn't up to her and left him in health
services.

68. As SHU Case Manager, Ms. Jackson frequently deals with the aftermath of fights and
assaults in the cell halls. Her supervisors, Chief Warden Dooley, Warden Young, and *New*
Warden Ponto, should have insured that she was properly trained in security procedures
including collecting statements and evidence or referring victims to staff who were
properly trained.

69. In health services, the Physician's Assistant stated that the scalp laceration was too *Remains, was 83*
shallow to suture and used silver nitrite to chemically cauterize the superficial vessels,
then packed both nostrils of Plaintiff's nose to stop the bleeding.

70. Plaintiff was then released to general population in the cell hall, covered in blood. Still no *Amended was 84*
photographs of his injuries had been taken and no statements beyond those necessary for
medical evaluation had been discussed. No statement was taken by correctional staff

about the savage assault nor were any questions asked concerning the possible motivation of the assailants or the gang leaders who ordered the attack.

71. After changing out of his bloodied clothing in his East Hall cell, Plaintiff attempted to eat lunch, but the nose bleed resumed. Officer J. Zoss ordered Plaintiff to a table by himself because the blood created a contamination risk for other inmates. *AMENDED WAS 85*

72. Plaintiff abandoned his lunch when blood began dribbling down his shirt and onto his lunch tray. *AMENDED WAS 85*

73. Because the bleeding would not stop, Plaintiff was taken to health services for a third time so he could be transported to the ER for treatment. Cpl. William Allen and CO J. Zoss took Plaintiff to the Avera trauma center in Sioux Falls. *AMENDED WAS 86*

74. While in the exam room, the escorting officers, Allen and Zoss, informed medical staff that there had been three assailants and the video showed the attack as occurring at 8:13 a.m. *AMENDED WAS 87*

75. Because there is only one camera in the card room and most of the attack was below the level of the tables, the officers' view of the assault was limited. *AMENDED WAS 88*

76. Cpl. Allen repeatedly asked Plaintiff if he had been kicked. Plaintiff stated that he did not believe so, just that there had been a "whole lot of fists." This was the only inquiry made concerning the specifics of the brutal gang assault by any SDDOC employee. *AMENDED WAS 88*

77. Cpl. Allen stated the assailants would be charged with felony assault with injury and suggested that the kicking would elevate the charges to aggravated assault, implying that the Division of Criminal Assault would prosecute the assailants. *AMENDED WAS 88*

78. Plaintiff repeated his request that the attackers be criminally charged and was assured they would be by both officers. *NEW*

11

79. Plaintiff's nose bleed continued, soaking through the wads of gauze and tape the prison had provided and CO Zoss gave Plaintiff paper towels to absorb the blood puddling on the prison jumpsuit.    *AMENDED WAS 89*

80. The ER physician examined Plaintiff and was unable to staunch the persistent and excessive bleeding, finally inserting a nasal tampon to exert pressure from the inside.    *REMAINS WAS 90*

81. The physician ordered a CAT scan for Plaintiff after Plaintiff stated that he didn't remember being hit in the face and thought a nose bleed from trauma to the back of the head seemed alarming.    *REMAINS WAS 92*

82. While waiting for the CAT scan, officers Allen and Zoss discussed working and training conditions. At one point, CO Zoss, a female, stated that she had been required to supervise inmate showers at JPA, a male facility, because there were no male officers working in the prison complex during that shift. Both she and the supervising officers who ordered the duty were aware that this was a Prison Rape Elimination Act violation, but the only other option available was to cancel showers entirely for the day.    *AMENDED WAS 93*

83. They discussed the tax issues involved when overtime was greater than twenty hours for the week, but less than twenty, concluding that after thirty hours of overtime (a seventy hour work week), there was enough money that the taxes were irrelevant. Cpl. Allen stated that he was already at eighteen hours of overtime for the week and expected to finish at more than twenty, which he considered a "light week."    *AMENDED WAS 94*

84. They also discussed the standard practice of "stealing" officers scheduled for rec crew to perform inmate transports, when the entire complement of assigned officers would have been too few to properly supervise the rec building, according to the ignored guidelines provided by superiors. Both officers believed this to be a dangerous practice.    *AMENDED WAS 95*

85. Both officers complained that supervisory personnel, such as Secretary of Corrections Dennis Kaemingk, Chief Warden Robert Dooley and Warden Darin Young, were aware *NEW* of staffing deficiencies, but were unable or unwilling to correct the problems.

86. They also stated that training hours had been cut to place new officers on the floor more quickly, resulting in partially trained officers being placed in the cell hall without direct *NEW* supervision.

87. This is the result of policies and procedures established by Secretary of Corrections Dennis Kaemingk, Chief Warden Robert Dooley, and Warden Darin Young, who failed *NEW* to properly screen, train, or educate the officers placed in control of inmates.

88. During an earlier conversation, CO Zoss claimed that she was a training officer and a certified hostage negotiator and thought SDDOC training was laughable compared to *NEW* other facilities at which she'd worked.

89. The CAT scan was performed and the physician stated that there were no fractures or *AMENDED WAS 96* internal hemorrhages.

90. Plaintiff was returned to SDSP at approximately 2:00 p.m. and sent directly to his *REMAINS WAS 97* original cell after being changed out of the transport uniform.

91. No photographs or statements had been taken and Plaintiff had not been provided with *REMAINS Was 99* clean, unbloodied clothes.

92. After the evening meal on Feburary 1, inmate George Dominguez came to Plaintiff's cell *AMENDED REMAINS Was 100 and 101* and informed him that the "gang upstairs" wanted him out of East Hall and he would be attacked again if he ever went to rec. Dominguez is also a parolee on administrative detainer housed in SDSP maximum/high medium security general population.

93. At approximately 10:00 p.m. that evening, a nurse from health services came to Plaintiff's cell with a card of antibiotics and told him to report to health services after sick call the next day to have the nasal tampon removed. AMENDED WAS 102

94. Before the nurse departed, Plaintiff informed the escorting officer that he had been threatened and was told to tell the regular unit officers in the morning. AMENDED WAS 103

95. On February 2, Plaintiff went to the officers' office and requested a pass to health services at 8:30 a.m., after sick call had been called and the East Hall corporal on duty called health services to confirm. The corporal was apparently told that no one in health services needed to see the Plaintiff. AMENDED WAS 104

96. At this time, Plaintiff told the corporal that there were threats against him and the officer placed his hand on his handcuffs and asked, "Do you want to refuse housing?" Plaintiff declined to be taken to the SHU and returned to his cell. AMENDED WAS 105

97. At 1:00 p.m. on February 2, Plaintiff went to afternoon rec with East Hall. Cpl. William Allen was stationed at the rec building entry gate and Plaintiff told him that there had been additional threats and the officers should keep their eyes open. AMENDED WAS 106

98. Cpl. Allen agreed, but did not ask any questions about the specifics of the threats or order Plaintiff to remain close to the officers until the threat was resolved. NEW

99. There were four officers to supervise more than 200 inmates and parolees in the rec building. East Hall houses nearly 400 offenders. AMENDED WAS 107

100. A few minutes after Plaintiff spoke to Cpl. Allen, inmate George Dominguez approached Plaintiff in the walking track area. Plaintiff believed his intent was to deliver an additional or more specific warning. Instead, Dominguez assaulted Plaintiff, striking him AMENDED was 108

14

across the upper right throat with his forearm, raising a lump on the corner of his jaw and bruising his throat.

101. There were no officers in the walking track area of the rec building where this second assault took place and no visible cameras. REMAINS WAS 109

102. Plaintiff found Cpl. Allen and another officer talking in the card room and described this incident and was told to wait by the entry gate until the access tunnel was clear. AMENDED WAS 110

103. While waiting, Plaintiff observed inmate Dominguez circling the gate area, When the two officers approached Plaintiff to discuss the attack, Dominguez began making threatening approaches, lunging with his fists balled up, while whispering to the officers to "cuff me up." REMAINS WAS 111

104. One of the officers secured George Dominguez and removed him from the rec building. REMAINS WAS 112

105. After Dominguez was escorted to the SHU, East Hall Case Manager Riley DeGroot arrived to escort Plaintiff back to the cell hall. CM DeGroot stated that Dominguez was "really weird" and asked Plaintiff to describe the assault. DeGroot stated that he could see a lump and some bruising on Plaintiff's throat. AMENDED WAS 113

106. Plaintiff speculated that Dominguez warned Plaintiff, made a token assault on him, and then made the threatening gestures which had him taken to the SHU because he was more afraid of the gangs running East Hall than of being punished by the Department of Corrections. Once removed from the cell hall for the "legitimate" reason of assaulting Plaintiff, Dominguez would be able to explain his motivation and request to be housed in a different unit without being labeled a "punk" or a "snitch." AMENDED WAS 104

107. As Case Manager, part of Mr. DeGroot's job is to assess and classify inmates based on their criminal and disciplinary history, assigning them to appropriate housing. NEW

108. Case Manager DeGroot returned Plaintiff to his cell in East Hall without being seen by health services.

109. Once again, no statement or photographs were taken by SDDOC Special Security.

110. After being returned to the cell hall after the second attack, Plaintiff spoke to East Hall Unit Manager Derrick Bieber, in his East Hall office. Plaintiff described the two assaults and asked to be placed on the loss-of-rec shower list for a week or two until the situation cooled down, knowing that asking to be removed from the cell hall meant a major write-up, equivalent in severity to fighting.

111. UM Bieber answered that Plaintiff wasn't on loss-of-rec status, because he wasn't being punished for a write-up and couldn't shower at that time. When pressed further for any measure of protection from the gangs ordering the assaults, UM Bieber said he would "look into it." (See attachment #4)

112. Plaintiff has not been contacted by, or spoken to UM Bieber since that day.

113. Plaintiff sent a kite [internal prison mail] to Parole Agent Aileen Winters stating, "I was just assaulted. Can I go back to CTP now?"

114. Plaintiff also spoke to several staff members, including Associate Warden Troy Ponto, Cpl. William Allen, and Lt. Ryan Vanderaa about the charges the assailants would face, when Plaintiff would be required to testify, and other questions related to the prosecution of the attackers. They all said they weren't sure, that the decisions would be made by the Division of Criminal Investigation.

115. On February 12, 2016, Parole Agent Winters came to the Plaintiff's cell to serve him with a revocation of parole report because Joshua Kaufman had terminated Plaintiff from treatment at Dakota Psychological services on December 29, 2015, some 45 days prior to

16

the issuance of the violation report. There were, and still are, no allegations or evidence of criminal activity. She stated that her supervisor, J.C. Smith, had ordered her to issue the revocation report.

116. Nothing of which the Plaintiff is aware took place between January 28, when Agent AMENDED WAS 123 Winters stated that she was expecting to schedule a monitor polygraph and return Plaintiff to full parole status and February 12, when Agent Winters informed Plaintiff for the first time that Mr. Kaufman had terminated him from treatment, other than the assaults herein described and Plaintiff's inquiries into the legal consequences of these brutal assaults. (see attachments #2-3)

117. Despite being placed on two administrative detainers by Parole Agents Winters and AMENDED WAS 124 Ripperda, Plaintiff has had no disciplinary infractions, other than being written up for being on the phone during count while at Unit C and possessing altered (repaired) gym shorts, since being returned to South Dakota custody in November 2014.

118. On February 17, 2016, the next regular business day after the parole revocation papers AMENDED WAS 126 were served, Plaintiff was finally moved to the West Hall housing unit to be housed with "lower threat level" inmates.

119. Despite the history of attacks, Plaintiff is still classified with an AIMS code of "B," NEW which indicates that he is considered a "high risk" level inmate.

120. On Saturday, March 19, 2016, at 12:55 p.m., in the SDSP dining hall, inmate Dan AMENDED WAS 129 Cromwell (SDDOC #16315) was struck by inmate Firestone. Firestone immediately surrendered to the officers in the dining hall and was cuffed and removed from the area. Within a few minutes, Sgt. S. Day approached inmate Cromwell at his table with a digital camera and took several photographs of the red marks on Cromwell's throat. Sgt. Day

17

offered to take a full statement regarding the incident. This is an example of how properly trained and supervised SDDOC officers and staff are required to respond to any incident involving inmate violence.

121. At no time since the first referenced assault on December 13, 2014, has Plaintiff spoken to any SDDOC Special Security staff member or a representative of the South Dakota Division of Criminal Investigation about the vicious assaults, threats he received, or his personal safety.

*AMENDED WAS 130*

122. After having his leg and nose broken in a sadistic brawl in the East Hall shower room by several inmates in December 2002, Plaintiff remained in the same East Hall cell with an "violent" AIMS code of "B". After surgery and several weeks in the prison infirmary, he was placed on individual medical showers and did not go to shower with East Hall population or go to rec at all for nearly three years until being transferred to the Mike Durfee State Prison in Springfield, South Dakota in September 2005, where he was placed in medical housing.

*NEW*

123. Plaintiff was originally assessed in 1997 as being a low-risk, non-violent offender with an AIMS code of "D" until he broke up horseplay in 1999 and was sent to the SHU. At that time, he was transferred to East Hall as a "violent" "B" classified inmate, which remains his current classification, despite a complete lack of major disciplinary write-ups and repeated assaults.

*NEW*

(EXHAUSTION OF REMEDIES)

124. Plaintiff filed grievances and administrative remedies concerning criminally charging the assailants and their "shot callers," the implementation of parole policies to protect Plaintiff and similarly situated parolees, and attempting to resolve the threats without

*AMENDED WAS 131-132*

18

requesting SHU time and surrendering his parole. (see attachments #1-4) There were no useful responses.

125. While preparing the original complaint at SDSP, Plaintiff saw as many as twenty inmates taken to the SHU for fighting in East Hall on a single day in mid-March. N EW

126. East Hall gang fights during the spring and summer of 2015 were so frequent and pervasive that inmates were being sent back to the cell hall after only a few days in the NEW SHU to make room for the next group of fighters. To the best of Plaintiff's knowledge, nothing was done to prevent or hinder the gang activities.

"GROUNDS FOR RELIEF"
## CONSTITUTIONAL CLAIMS

127. Defendants Dennis Kaemingk, Robert Dooley, and Darin Young have failed to properly staff the South Dakota Department of Corrections. Due to chronic understaffing, predatory inmates are, by default, allowed to "run" the cell halls at SDSP, savagely attacking inmates of the "wrong" race or who have been convicted of the "wrong" NEW crimes. The administration has a duty to protect inmates, and by understaffing the facility, have allowed an atmosphere of deliberate indifference to exist, which makes it very likely that sex offenders and non-violent inmates will be assaulted. Regardless of the official policies, the "effective" policies officers observe through the actions of their superiors and senior staff discourage proactive correctional officers' attempts to resolve or prevent violence. A violation of United States Constitutional Amendment VIII.

128. Defendants Robert Dooley and Darin Young have a duty to implement procedures for safe placement of inmates and promulgate these rules to all staff and to ensure that they NEW

19

are followed. In addition, these defendants have a responsibility to train all staff members to remove an inmate from general population at any time he feels threatened. A violation of United States Constitutional Amendment VIII.

129. Defendants Dennis Kaemingk, Robert Dooley, Darin Young, Troy Ponto, Tim Meirose, Derrick Bieber, William Allen, Aileen Winters, and other Unknown SDDOC employees violated Plaintiff's rights under the United States Constitution, Amendment VIII, when they were aware that Plaintiff had been severely beaten on three other occasions, and the threat of violence to him is so substantial *that their knowledge can be inferred*, yet they failed to take reasonable steps to prevent harm to him.

130. Defendant Robert Dooley maintains a policy of "mixing" violent and non-violent offenders to help control the prison population. This classification system is faulty and places inmates as young as eighteen with hardened violent repeat offenders and slight inmates with monster weight lifters. In Plaintiff's case, a large but timid inmate was repeatedly housed with predators and gang members. All of the systemic deficiencies in staffing, facilities, procedures, and classification make suffering inevitable. A violation of United States Constitutional Amendment VIII.

131. Defendants Tim Meirose, Derrick Bieber, William Allen, and Aileen Winters were all made aware of threats to Plaintiff and his attempts to receive protection. None of them assisted him and even after a brutal assault and trip to the ER, he was still placed back in East Hall, an open invitation to another assault, which happened immediately. A violation of United States Constitutional Amendment VIII.

132. Defendants Derrick Bieber, Aileen Winters, and William Allen, after Plaintiff was assaulted a second time, knew that the risk to him was of such a nature and degree that to

20

disregard it was a gross deviation from the standard of care a Department of Corrections or State employee should have exercised in this instance. A violation of United States Constitutional Amendment VIII.

133. Defendants William Allen and Unknown SDDOC officers who stated Plaintiff would be subjected to major disciplinary action for requesting protective custody and forced him to choose between parole (freedom) and personal safety, set a barrier that prevented   N E W Plaintiff from being able to maintain his own safety. A violation of United States Constitutional Amendment VIII.

## RELIEF REQUESTED

I. A declaration stating that all defendants violated the constitutional rights of Winston
   N E W
   Grey Brakeall

II. An injunction ordering the South Dakota Department of Corrections to reformulate their classification system to better match inmates in criminal history, record of violence, age,   N E W and personality.

III. An injunction ordering the Department of Corrections to implement a protective custody
   N E W
   policy which will remove inmates from general population without fear of being subjected to disciplinary action, and to train all staff in the implementation of this policy to prevent future violence and injury to inmates.

IV. Defendants Robert Dooley, Dennis Kaemingk, and Darrin Young, for allowing an
   N E W
   environment to exist where violence and injury are likely, and for the classification

21

system and actual injury to Plaintiff, $25,000.00 from each defendant in their individual capacities in compensatory damages.

V.    Defendants Tim Meirose, Derrick Bieber, Aileen Winters, William Allen, and other    *N E W*
Unknown Corrections Officers in their individual capacities, $50,000.00 per defendant in compensatory damages.

VI.   For failing to protect Plaintiff from numerous assaults which resulted in serious bodily   *N EW*
harm, $100,000.00 in punitive damages

VII.  A trial by jury on all issues triable by jury.         *AMENDED*

VIII.  Any other relief that this Court deems proper and just.      *REMAINS*
                                                    *WAS VIII*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Subscribed and sworn to this _/2_ day of _August_, 2016.

_____
Winston Grey Brakeall #22268, pro se
Mike Durfee State Prison
1412 Wood St.
Springfield, SD 57062

9-12-16

Notary Public- South Dakota

My Commission expires: _____

T. JOHNSON DEJONG
NOTARY PUBLIC
SOUTH DAKOTA
SEAL

My Commission Expires
February 22, 2018