UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WINSTON GREY BRAKEALL, | 4:16-CV-04057-KES |
| Plaintiff, | |
| vs. | ORDER DENYING MOTION FOR SUMMARY JUDGMENT |
| DENNIS KAEMINGK, SECRETARY OF CORRECTION FOR THE STATE OF SOUTH DAKOTA; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; ROBERT DOOLEY, CHIEF WARDEN FOR THE SOUTH DAKOTA DEPARTMENT OF CORRECTIONS; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; DARIN YOUNG, WARDEN AT SDSP; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; DERRICK BIEBER, UNIT MANAGER AT SDSP; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; TIM MEIROSE, UNIT MANAGER AT SDSP; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; WILLIAM ALLEN, CORRECTIONAL OFFICER WITH THE RANK OF CORPORAL AT SDSP; IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; AND  UNKNOWN DEPARTMENT OF CORRECTIONS EMPLOYEES, SDDOC EMPLOYEES EMPLOYED AT SDSP, JPA, AND/OR UNIT C IN SIOUX FALLS, SOUTH DAKOTA; IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; | |
| Defendants. | |

Plaintiff, Winston Grey Brakeall, filed this lawsuit under 42 U.S.C. § 1983. Docket 1. The court stayed discovery until the court determines the issue of qualified immunity. Docket 57. Defendants now move for summary judgment based on qualified immunity. Docket 67. Brakeall opposes the motion. Docket 96.

## FACTUAL BACKGROUND[1]

Viewing the evidence in the light most favorable to Brakeall, as the non-moving party, the facts are:

On November 4, 2014, Brakeall was taken into custody on a warrant from the South Dakota Board of Pardons and Paroles (the Board). Docket 40 ¶ 16. On December 11, 2014, Brakeall was transferred to East Hall at the Jameson Prison Annex (JPA) in the South Dakota State Penitentiary (SDSP). *Id.* ¶ 18. After arriving at JPA, Brakeall told the admitting officer that he would not be safe in the general population in East Hall. *Id.* ¶ 18. Brakeall then spoke to Unit Manager Tim Meirose and Brakeall informed Meirose that he would be at risk in the general population in East Hall. *Id.* ¶¶ 20-21. Meirose told Brakeall no other cells were available and offered him the options of accepting the assigned cell or going to the special housing unit (SHU) for refusing housing, a major rule violation. *Id.* ¶ 22. In order to protect the possibility of parole, Brakeall accepted his housing assignment in East Hall. *Id.* ¶ 23.

---

[1] Because defendants move for summary judgment, the court recites the facts in the light most favorable to Brakeall. Where the facts are disputed, both parties' averments are included.

As Brakeall got ready for breakfast the next morning, he heard other prisoners call him "Chomzilla," a sobriquet derived from "child molester," which references Brakeall's underlying conviction, and "Godzilla," which references Brakeall's immense size (Brakeall is 6' 9", 330 pounds). Docket 1 ¶¶ 29, 54. This was an insult used against Brakeall during the sixteen years when he was previously incarcerated at SDSP. *Id.* ¶ 29. After breakfast, Brakeall was confronted by his cellmate, a gang member. *Id.* ¶ 30. The cellmate said he had been ordered to assault Brakeall, but had refused the order to save his parole eligibility. *Id.* Later, Brakeall's cellmate was beaten by the gang for refusing to assault him. *Id.* ¶ 33. Brakeall told prison staff about the threats against him, but nothing was done. *Id.* ¶ 31. Brakeall did not want to cause trouble because he also wanted to save his parole eligibility. *Id.* At the time, he was still awaiting his parole revocation hearing. *Id.* ¶ 34. Brakeall's cellmate told him that other prisoners were spreading rumors about him, saying he had been re-incarcerated because he had committed another sex offense. *Id.* ¶ 32. The cellmate claimed the rumors were spread to encourage prisoners to assault Brakeall. *Id.*

On December 13, 2014, Brakeall was assaulted in the SDSP dining hall. *Id.* ¶ 23. After the assault, while being evaluated by health services, an unknown correctional officer gave Brakeall three options: he could go back to his cell, he could refuse housing, or he could ask for protective custody in the SHU. *Id.* ¶ 24. The officer told Brakeall that seeking protective custody "gives you kind of a reputation as a punk." *Id.* Thus, Brakeall returned to his cell. *Id.*

Brakeall claims there is no true protective custody in the South Dakota Department of Corrections (DOC). *Id.* To move into protective custody, an inmate must be willing and able to identify the threatening individuals. Docket 94 ¶ 22; *see also* Docket 78 ¶ 32. Brakeall did not know the identities of the threatening individuals. Docket 94 ¶ 29. Brakeall had not yet spent enough time at SDSP to know or identify any of the gang members who were threatening him. *Id.* ¶ 31.

Defendants aver that SDSP has an Operational Memorandum in place to protect inmates that believe they are in danger. Docket 78 ¶ 12. Defendants state, "If an inmate believes he is in danger he must notify a staff member who will immediately notify the officer in charge. The inmate can make this request without fear of being written up for a rule violation." *Id.* ¶ 13. Brakeall also points out a provision in the memorandum that reads, "If staff becomes aware of an inmate's need for protection, even though not requested, the same procedure for requested protective custody apply." Docket 94 ¶ 12. Brakeall acknowledges that the memorandum was in place but claims the staff was inadequately trained to implement it. *Id.*

After the December 13, 2014 assault, the assailant told the unknown correctional officer that the threat against Brakeall from gangs in East Hall was severe. Docket 40 ¶ 25. The officer then sent Brakeall to West Hall for his protection. *Id.* ¶ 26. Despite the DOC policy requiring an incident report, no photographs of Brakeall's injuries or statements were taken by prison staff,

and no incident report was made. *Id.* ¶ 27. Defendants aver that the assailants are still unknown. Docket 68 at 11.

On December 14, 2014, Brakeall's arrest warrant was dropped, and he was placed on parole. Docket 1 ¶ 42. Two days later, he was transferred to the Unit C Trustee facility in the Community Transition Program (CTP). *Id.* Starting in January 2015, Brakeall was given time off the unit for treatment, but otherwise confined at the prison. *Id.* ¶ 43.

In April 2015, Brakeall was arrested and placed on a ninety day administrative detainer for failing a polygraph test. Docket 40 ¶ 28. There was no evidence or allegations of any criminal activity. *Id.* For most of April 2015, Brakeall was held in JPA. *Id.* ¶ 29. He was threatened by other inmates and his belongings were stolen. *Id.* Again he told prison staff what was happening, but they did nothing. *Id.*

Brakeall was later returned to the CTP program. *Id.* ¶ 30. But on December 1, 2015, Brakeall was arrested again for failing a polygraph test. *Id.* He was placed on administrative detainer and moved to general population in JPA. *Id.* The next day, he was transferred to East Hall. *Id.* ¶ 31. Brakeall warned several members of prison staff, including Unit Manager Derrick Bieber, that he was in danger. *Id.* ¶ 32. Bieber was aware that Brakeall had been previously assaulted in the East Hall shower in 2002. Docket 94 ¶ 27. Brakeall again was given the option of accepting his cell in East Hall or being written up and sent to the SHU. Docket 40 ¶ 32. In order to save his parole eligibility, he chose the former. *Id.*

On December 14, 2015, Parole Agent Aileen Winters came to Brakeall's cell and told him that she and J.C. Smith, her supervisor in the parole department, planned to have Brakeall stay in SDSP for 90 days, take a polygraph, and if he passed, he would be paroled back to CTP. *Id.* ¶ 33. Brakeall informed Winters that he had previously been assaulted in East Hall and had been threatened. *Id.*¶ 34. Winters told Brakeall to speak with unit staff. *Id.* When Brakeall informed Winters that he had already spoken to unit staff, Winters told him to figure it out. *Id.* ¶¶ 34, 35.

In January 2016, two inmates told Brakeall that the gangs in East Hall warned them not to associate with Brakeall and that the gangs were going to assault Brakeall or extort protection money from him. *Id.* ¶ 36. They explained that because of Brakeall's size and the fact that he would not fight back in order to protect his parole eligibility, other prisoners planned to attack him to "make their bones" without fear that he would fight back. *Id.* ¶ 37.

Brakeall told Bieber about the threats and Bieber said he would "look into it." *Id.* ¶ 38. When Brakeall told other correctional officers about the threats, they told him that without the names of inmates who were going to attack him, they could do nothing to protect him. *Id.* ¶ 39.

On February 1, 2016, Brakeall was assaulted again. *Id.* ¶¶ 43, 45. He was in the recreation building, playing cards with another inmate when he was struck from behind and knocked to the floor. *Id.* ¶ 41. There were no correctional officers in the card room. *Id.* ¶ 44. Brakeall believes that he was beaten by three inmates for at least one minute, where the assailants punched

and kicked him in the head, back, and torso. *Id.* ¶¶ 44, 45. Defendants contend that video footage shows that two inmates assaulted Brakeall and the attack lasted seventeen seconds. Docket 78 ¶54. The attack did not stop until the assailants left on their own accord. Docket 40 ¶ 47. By the time the assault ended, Brakeall was bleeding profusely from his nose and head, and a fellow inmate worried that Brakeall's skull had been fractured. *Id.* ¶¶ 47, 49.

After the assault, Brakeall recovered his broken glasses and saw that no correctional officers or staff were present. *Id.* ¶¶ 49, 50. Brakeall, covered in blood and still bleeding, found a correctional officer and told him about the attack. *Id.* ¶ 54. The officer called for an escort to take Brakeall to health services. *Id.* ¶ 55. After several minutes, Lieutenant Ryan Vanderaa escorted Brakeall to health services. *Id.* Brakeall told Vanderaa that he wanted the attackers to be criminally charged because he was a parolee on an administrative detainer, not an inmate. *Id.* ¶ 57. Vanderaa said that the attackers would be charged and that pictures of Brakeall's wound and statements about the attack would be taken. *Id.*

Health services bandaged Brakeall's wounds. *Id.* ¶ 58. His injuries included:

> [A] deep trauma nose bleed; right temple laceration; left temple abrasion; extensive bruising and swelling of the left ear; extensive bruising to both forearms; abrasions on his right elbow; "goose eggs," pain and swelling at impact points across both temples, across the back and crown of his skull, at the base of the skull where the spine enters; muscular trauma to the neck, jaw, and torso; and bruising which reached Plaintiffs lower back.

*Id.* ¶ 48. While being seen by health services, Brakeall complained of dizziness and nearly fell over multiple times. *Id.* ¶ 58. No photos or statements were taken. *Id.* ¶ 59.

After Brakeall was seen by health services, Vanderaa handcuffed him and brought him to the SHU for investigative purposes. *Id.* ¶ 60. When they got to the SHU, Vanderaa was told that the inmates who attacked Brakeall were being taken to the SHU, so Vanderaa took Brakeall to the SHU main gate and put him in a holding cell. *Id.* ¶¶ 61-63. Brakeall was still bleeding and asked prison staff for help, but they did nothing. *Id.* ¶ 64. Forty minutes later, SHU Case Manager Lana Jackson came to the holding cell and told Brakeall that he was going back to East Hall. *Id.* ¶ 66. When Jackson saw that Brakeall was still bleeding, she took him to health services. *Id.* ¶ 67.

After leaving health services, Brakeall dressed and went to lunch. *Id.* ¶ 71. His nose started bleeding again and correctional officer J. Zoss ordered him to eat by himself to avoid contamination. *Id.* ¶ 72. Because he was still bleeding, Brakeall abandoned his lunch. *Id.* Brakeall was taken to health services in order to go to the emergency room at the Avera trauma center. *Id.* ¶ 73. He was escorted by correctional officers William Allen and Zoss. *Id.*

According to Brakeall, Allen and Zoss told the medical staff that the video from the recreation building showed that three inmates attacked Brakeall at 8:13 a.m. *Id.* ¶ 74. After numerous attempts, the doctor stopped Brakeall's nose bleed. *Id.* ¶ 80. The doctor ordered a CAT scan because

Brakeall could not remember whether he was hit in the face, but the scan showed no fractures or internal hemorrhages. *Id.* ¶¶ 81, 89.

While they waited for the results of the scan, Allen and Zoss discussed overtime work at the prison. *Id.* ¶ 82. Defendants dispute that staffing issues were discussed in the presence of inmates. Docket 78 ¶ 39. Allen said he expected to do over twenty hours of overtime that week. *Id.* ¶ 83. Both officers complained that supervisory personnel, Dennis Kaemingk, Robert Dooley, and Darin Young, were aware of the staffing deficiencies but were unwilling to correct the problems. *Id.* ¶ 85.

Allen and Zoss also discussed the "stealing" of correctional officers from recreation when an officer was needed to transport an inmate. *Id.* ¶ 84. The correctional officers stated that the group assigned to the recreation building would not have been enough even before some were "stolen." *Id.*

Inmates later told Brakeall that SDSP was operating with nine fewer officers than were required on February 1, 2016. *Id.* ¶ 53. He also learned that the staff member responsible for monitoring the video feed in the recreation building was playing games on her phone. *Id.* ¶ 52.

Defendants contend that "[t]he staffing plan sets minimum required staffing for all essential areas of the prison for each shift. Those minimum staffing numbers are usually always met." Docket 78 ¶ 17. The minimum staffing level may not be met when an emergency situation arises and staff responds to a different area. *Id.* But defendants contend this is rare and someone is reassigned to cover as soon as possible. *Id.*

When Brakeall returned to SDSP at approximately 2:00 p.m., he was put in his original cell. Docket 40 ¶¶ 90, 97. He was not taken to health services for treatment. *Id.* At no point did prison staff take pictures of his injuries, take statements from witnesses or the people involved in the assault, or do anything to secure evidence from the scene of the assault. *Id.* ¶¶ 70, 91. This information is supposed to be collected after fights at SDSP. *Id.* ¶ 120. Brakeall informed staff that he was a parolee on detainer, not an inmate, and thus he wanted the perpetrators criminally charged. Docket 94 ¶ 55. Defendants claim that after the assault a violation report was prepared describing the incident and the perpetrators were sanctioned and sentenced to sixty days in the disciplinary unit. Docket 78 ¶ 55. And a separation order was put in place so that Brakeall and the offending inmates could no longer be housed together. *Id.*

After dinner on February 1, 2015, inmate George Dominguez told Brakeall that the gangs in East Hall wanted him out of East Hall and that he would be attacked if he went to recreation. Docket 40 ¶ 92. That night, a nurse came to Brakeall's cell to deliver medication and told him to go to health services the next day. *Id.* ¶ 93. Brakeall told the correctional officer who escorted the nurse about Dominguez's threats. *Id.* ¶ 94. The correctional officer told Brakeall to tell staff in the morning. *Id.*

The next day, when Brakeall tried to go to health services, a correctional officer in East Hall told him nobody needed to see him in health services. *Id.* ¶ 95. When Brakeall told the correctional officer about the threats against

him, the officer put his hand on his handcuffs and asked Brakeall, "Do you want to refuse housing?" *Id.* ¶ 96. Brakeall returned to his cell. *Id.*

Later that day, Brakeall went to recreation. *Id.* ¶ 97. That day, there were four correctional officers supervising over 200 inmates and parolees in the recreation building. *Id.* ¶ 99. Allen was stationed at the gate, and Brakeall told him about the most recent threats and that officers should keep their eyes open. *Id.* According to Brakeall, Allen agreed but did not ask any further questions. *Id.* ¶ 98. Brakeall alleges that Allen violated the operational memorandum for when staff become aware of an inmate in danger. Docket 94 ¶ 12. Brakeall remained close to the officers until the threat was resolved. Docket 40 ¶ 98. Defendants claim that Allen asked Brakeall to identify the person, or persons, that he believed were going to harm him, but Brakeall said he did not know. Then Allen told him he could go to his cell to get away from the situation. Docket 78 ¶ 40.

Brakeall went to the walking track. Docket 1 ¶ 108. There were no cameras or officers in the walking track area. Docket 40 ¶ 101. Dominguez approached Brakeall. *Id.* ¶ 100. Brakeall thought Dominguez was going to deliver an additional or more specific warning from a prison gang, but instead struck Brakeall in the throat with his forearm. *Id.* The strike raised a lump on the corner of his jaw and bruised his throat. *Id.* Brakeall went to the card room, found two officers there, and told them that Dominguez had assaulted him. *Id.* ¶ 102. The officers told Brakeall to wait at the gate. *Id.*

When Brakeall went to the gate, Dominguez approached and began circling Brakeall. *Id.* ¶ 103. Officers arrived at the gate, handcuffed Dominguez, and removed him from the recreation building. *Id.* ¶ 104. Then East Hall Case Manager Riley DeGroot arrived to escort Brakeall back to East Hall. *Id.* ¶ 105. DeGroot said he could see a lump and bruising on Brakeall's throat where Dominguez had struck him. *Id.* Brakeall told DeGroot that Dominguez assaulted him because Dominguez feared the gangs in East Hall more than he feared the correctional officers. *Id.* ¶ 106. If he assaulted Brakeall, Dominguez would be transferred out of East Hall and away from the gangs without repercussion. *Id.* DeGroot returned Brakeall to East Hall without bringing him to health services, taking statements from witnesses, or taking photos of Brakeall's injuries. *Id.* ¶¶ 108, 109.

That afternoon, Brakeall told Bieber about the assault and asked Bieber to put him on loss-of-recreation shower until the situation "cooled down." *Id.* ¶ 110. Bieber refused. *Id.* ¶ 111. When Brakeall pressed Bieber to protect him, Bieber said he would "look into it." *Id.* Bieber has not spoken to Brakeall since that day. *Id.* ¶ 112. Brakeall spoke to Allen and Vanderaa about bringing charges against the attackers, but they said that the Division of Criminal Investigation (DCI) would make those decisions, and they did not know anything about it. *Id.* ¶ 114.

Brakeall told Winters about the assault and asked to be returned to CTP. *Id.* ¶ 113. In response, on February 12, 2016, Winters delivered a revocation of parole report to Brakeall. *Id.* ¶ 115. Apparently, Joshua

Kaufman, a sex offender treatment provider employed by Dakota Psychological Services, had terminated Brakeall from treatment forty-five days earlier on December 29, 2015. *Id.* Winters said Smith had told her to issue the revocation report. *Id.* According to Brakeall's complaint, there were no allegations that he had violated parole or committed a crime and he had no serious disciplinary infractions while at SDSP; the only things that had happened since Winters told him they were scheduling a polygraph were the assaults. *Id.* ¶ 116.

Five days after Brakeall was served with the parole revocation report, he was transferred to West Hall in order to be housed with "lower threat" inmates. *Id.* at ¶ 118. Despite the history of attacks, Brakeall is still classified with an AIMS code of "B," which indicates that he is considered a "high risk" level inmate.[2] *Id.* ¶ 119.

Brakeall was incarcerated at SDSP from 1997-2005 and believes staffing levels today are similar or less than what they were then. Docket 94 ¶ 3. Yet defendants contend that the staff level for East Hall was increased in July 2014 and the minimum staff levels for all units of the SDSP have been increased since Young became warden. Docket 78 ¶¶ 3, 4. Defendants aver that if a unit is below the minimum staffing level, additional staff will be moved to that unit to assure the minimum levels are complied with. *Id.* ¶ 5.

---

[2] AIMS is an acronym for the Adult Internal Management System utilized by the South Dakota DOC. AIMS is a correctional management tool designed to identify male inmates based in part on their life history/personal background and observed behavior while incarcerated.

The 2016 Prison Rape Elimination Act (PREA) audit of the SDSP shows sufficient staffing levels for each shift. *Id.* ¶ 51. The prison will pay as much overtime as is necessary to fill posts. *Id.* ¶ 5. But Brakeall alleges that excessive overtime has an adverse effect on staff and leaves posts inadequately filled. Docket 94 ¶ 5. Brakeall also alleges that, under the direction of Kaemingk, various accounting tricks deflate occupancy levels and thus less staff is required. *Id.* ¶46.

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation ommitted).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners

proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## DISCUSSION

### A. Official Capacity Claim

Brakeall has sued each of the defendants in their official capacity. Docket 1 at 2. As the Supreme Court has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66. The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.*

Here, as part of Brakeall's requested remedy, he seeks to recover money damages. Docket 1 at 25-27. Consequently, because Brakeall has sued defendants in their official capacities, Brakeall has asserted a claim for money damages against the state of South Dakota. The state of South Dakota has not waived its sovereign immunity. Thus, to the extent Brakeall seeks to hold defendants liable in their official capacities for money damages, the court finds that defendants are protected by sovereign immunity and are entitled to judgment on this issue as a matter of law.

**B. Declaratory and Injunctive Relief Claim**

Brakeall also seeks declaratory and injunctive relief. Claims for declaratory and injunctive relief are rendered moot when a prisoner is released or transferred to another facility. *See Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (discussing *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998) and *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985)). This is true even if the prisoner argues he might, at some future time, be incarcerated at the same prison. *Smith*, 190 F.3d at 855. Brakeall was transferred from SDSP to the Mike Durfee State Prison in Springfield, South. Therefore, his claims for declaratory and injunctive relief are moot.

**C. Qualified Immunity**

Defendants in their individual capacity contend that they are entitled to qualified immunity. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or

the United States Constitution. 42 U.S.C. § 1983. The doctrine of qualified immunity, however, generally shields " 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014) (alteration omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To overcome a qualified immunity defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The court may analyze these two factors in either order. *Hutson v. Walker*, 688 F.3d 477, 483 (8th Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). But "[t]o deny the officers qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor." *Hawkins v. Gage Cty.*, 759 F.3d 951, 956 (8th Cir. 2014).

### 1. Failure to Protect

The court first considers Brakeall's claim against Meirose, Bieber, and Allen. Brakeall alleges these defendants failed to protect him from being assaulted on three occasions. For the latter two assaults, Brakeall was a pretrial detainee. Part of his claim is therefore analyzed under the Fourteenth

Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456–57 (8th Cir.2004) (citing *Ervin v. Busby*, 992 F.2d 147, 150 (8th Cir. 1993) (per curiam) (finding that pretrial detainees' claims are evaluated under Due Process Clause rather than Eighth Amendment)).

Although the Eighth Circuit has not ruled on the amount of protection afforded to pretrial detainees under the Fourteenth Amendment Due Process clause, pretrial detainees like Brakeall have been afforded at least as much protection as under the Eighth Amendment. *Hartsfield*, 371 F.3d at 457. The Eighth Circuit has discussed the difference between the Eighth Amendment protection from cruel and unusual punishment and the Fourteenth Amendment protection from punishment prior to adjudication of guilt but has consistently applied the deliberate indifference standard "to pretrial detainee claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee from a serious risk of harm." *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"Because being subjected to violent assault is not 'part of the penalty that criminal offenders [must] pay for their offenses,' '[t]he Eighth Amendment imposes a duty on the part of prison officials to protect prisoners from violence at the hands of other prisoners." *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998)).

> In order to establish an Eighth Amendment failure-to-protect claim, a plaintiff must show that the prison official was deliberately indifferent to a 'substantial risk of serious harm. In doing so, a

prisoner must satisfy two requirements. . . . The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious; i.e., whether the inmate is incarcerated under conditions posing a substantial risk of serious harm. The second requirement is subjective and requires that the inmate prove that the prison official had a sufficiently culpable state of mind. In prison conditions claims, . . . the subjective inquiry regarding an official's state of mind is one of deliberate indifference to inmate health or safety. An official is deliberately indifferent if he or she actually knows of a substantial risk and fails to respond reasonably.

*Walls v. Tadman*, 762 F.3d 778, 782 (8th Cir. 2014) (quoting *Whitson*, 602 F.3d at 923) (internal quotations and citations omitted). Thus, Brakeall must show: (1) that his incarceration in East Hall posed a substantial risk of serious harm, and (2) Meirose, Bieber, and Allen knew of and disregarded that risk. *See Farmer*, 511 U.S. at 834.

In assessing whether Brakeall's allegations support a finding that Brakeall was subject to an objective, substantial risk of serious harm, the court finds *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007) particularly instructive. In *Young*, shortly after the plaintiff was moved into a cell, the plaintiff requested that the new cellmate keep the television volume low, and the cellmate shouted, "[y]ou don't tell me what to do or anything else"; cursed at the plaintiff; and told the plaintiff that if he had a problem, the plaintiff would have to deal with the cellmate and his "boys." *Id.* at 870. The plaintiff reported the threat to a prison official that day and requested an immediate transfer to a new cell. The next day he repeated the report to a second prison official. *Id.* at 870–71. Shortly after this second report, the cellmate and two other inmates attacked the plaintiff in his cell. *Id.* The Eighth Circuit found sufficient evidence

of a substantial risk of serious harm to preclude summary judgment based on qualified immunity. *Id.* at 872–83. It stated that the cellmate's conduct was "the most probative evidence of the degree and type of risk that [the plaintiff] faced" and found that the assailant's conduct toward the plaintiff, by itself, raised a reasonable inference of a substantial threat of violence against the plaintiff. *Id.* at 872. Also the court noted that the fact that plaintiff had promptly reported the threat and then repeated it the next day strengthened the inference of a substantial risk of serious harm to the plaintiff. *Id.* at 872–73. Even though Brakeall was not able to identify the source of the threat, the instant case shares significant characteristics with *Young*. As in *Young*, Brakeall was threatened with bodily harm and reported it multiple times to staff.

It is undisputed that Brakeall's housing assignment in East Hall posed a substantial risk of serious harm. Brakeall was a victim of an assault in 2014, and had been approached by multiple inmates warning of a forthcoming assault. Docket 40 ¶¶ 36, 37, 92. Brakeall was then assaulted two additional times in 2016. *Id.* ¶¶ 43, 100. Objectively, Brakeall's housing assignment among the general population in East Hall, in a housing unit where he was known as Chomzilla and where he had previously been assaulted, placed Brakeall at substantial risk of serious harm.

Defendants dispute that they acted with deliberate indifference towards Brakeall's serious risk of harm. But the undisputed facts show that Brakeall informed staff that he believe he faced a risk of assault and that Brakeall was

not placed in protective custody. *Id.* ¶¶ 21, 32, 38, 97, 98, 110, 111, 112. It is disputed whether or not Brakeall was offered protective custody and, if offered, whether or not he could have been placed in protective custody when he could not name his potential attackers.

Defendants claim that Brakeall failed to communicate a specific threat. Brakeall offered the 2014 assault as evidence of a threat in East Hall and communicated the threats as he received them. Brakeall contends that he could not be more specific because he did not know who was housed in East Hall, as he had just arrived. Defendants also state that Brakeall still cannot establish who assaulted him in 2014. But this only shows that Brakeall communicated the most specific threat he could, given the information he possessed. Defendants further refute the existence of a threat before the third attack because Brakeall thought Dominguez was just going to convey further information about a threat. But the fact that Brakeall did not expect an assault from Dominguez is consistent with the fact that Brakeall did not know who he was threatened by.

Defendants further argue, even if Bieber, Meirose, and Allen knew of a specific threat against Brakeall, Brakeall knew he could request protective custody. Defendants claim that they fulfilled their duty to Brakeall when they offered to place him in protective custody. Docket 68 at 12. Viewing the evidence in the light most favorable to Brakeall, Brakeall did not know he could get protective custody. Brakeall was discouraged from seeking protective custody. Docket 40 ¶ 24; Docket 94 ¶¶ 21, 24. Brakeall knew he could not

name an individual responsible for the threat, something defendants state is necessary to request protective custody. Docket 78 ¶¶ 29, 40. And it is disputed whether or not Bieber, Meirose, and Allen actually offered protective custody. Docket 40 ¶¶ 22, 32, 38, 39, 96, 110. Brakeall claims he spoke to several officers, including Bieber, and received the same two options: he could accept the cell assignment or go to the SHU on a major write-up for refusing housing effectively surrendering his parole. Docket 40 ¶¶ 22, 32. Defendants also allege that Brakeall never requested protective custody. But viewing the evidence in the light most favorable to Brakeall, the record is replete with requests for protection from the danger Brakeall faced in East Hall.

At this stage, before discovery has begun, the court finds, viewing the facts and inferences from those facts in the light most favorable to Brakeall, that he has set forth sufficient facts to demonstrate a constitutional deprivation.

The second prong of the qualified immunity analysis asks whether "the right was clearly established at the time of the deprivation." *Howard*, 570 F.3d at 988. In *Farmer v. Brennan*, the United States Supreme Court held that the Eighth Amendment encompasses an inmate's right to be protected from harm by fellow inmates. 511 U.S. at 833. In addition, a prison official violates an inmate's right to protection when he or she acts with reckless disregard, which is defined as a "pervasive risk of harm" to which the officials failed to reasonably respond. *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir.1991).

The court finds that Brakeall has shown that the facts, viewed in the light most favorable to him, demonstrate that he was deprived of a constitutional right, and that the right was clearly established at the time of the deprivation. Thus, at this time, summary judgment is denied as to Meirose, Bieber, and Allen, on qualified immunity as to Brakeall's failure to protect claim.

## 2. Failure to Properly Staff SDSP

Brakeall alleges that Kaemingk, Dooley, and Young violated his Eighth Amendment rights by failing to properly staff SDSP. Docket 40 ¶ 127. He alleges that the understaffing led to his attacks. *Id.* He also alleges that he was injured more severely because his attacks were not stopped and that the attacks were not stopped because of the insufficient number of staff at SDSP. *Id.*

To sufficiently allege that conditions of confinement violate the Eighth Amendment, a prisoner must assert the following:

> (1) the alleged deprivation is, 'objectively, sufficiently serious,' resulting 'in the denial of the minimal civilized measure of life's necessities,' and (2) that the prison officials were deliberately indifferent to 'an excessive risk to inmate health or safety,' meaning that the officials actually knew of and disregarded the risk.

*Williams v. Delo*, 49 F.3d 442, 445 (8th Cir.1995) (quoting *Farmer*, 511 U.S. at 834). Nonetheless, "the Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Thus, with regard to the first element, a prison condition is not deemed cruel and unusual unless it "inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of the

crime warranting imprisonment." *Id.* at 348; *see also Rhodes*, 452 U.S. 337 at

347 ("To the extent that such conditions are restrictive or even harsh, they are

part of the penalty that criminal offenders pay for their offenses against

society.").

With regard to the second element, "constructive knowledge, or the

'should have known' standard, is not sufficient to support a finding of

deliberate indifference. . . ." *Spruce v. Sargent*, 149 F.3d 783, 786 (8th

Cir.1998). "Absent a showing that the prison officials consciously understood

that prison conditions created such an excessive risk, the conditions are not a

punishment within the meaning of the Eighth Amendment." *Williams*, 49 F.3d

at 445.

Brakeall sets forth allegations that call into question whether the

staffing levels were adequate and whether records of assaults accurately

reflect the number of assaults actually occurring in SDSP. First, he claims

defendants use various accounting maneuvers to maintain staff levels lower

than is safe. Docket 96 at 4-5. Brakeall also alleges that, under the direction

of Kaemingk, these defendants manipulated the occupancy levels and as a

result the minimum staffing levels. Docket 94 ¶ 46.

Brakeall alleges that Allen and Zoss complained that supervisory

personnel, such as Dennis Kaemingk, Robert Dooley, and Darin Young, were

aware of the staffing deficiencies but unwilling to correct the problems.

*Id.* ¶ 85. Defendants use the 2016 PREA audit to show they were fully staffed.

*See* Docket 78 ¶ 50. Defendants contend that "[t]he staffing plan sets

minimum required staffing for all essential areas of the prison for each shift. Defendants contend that those minimum numbers are usually always met." *Id.* ¶ 17. The minimum may not be met when an emergency situation arises and staff responds to a different area. *Id.* If a unit is below the minimum staffing level, additional staff will be moved to that unit to assure the minimum levels are complied with. *Id.* ¶ 5. The prison will pay as much overtime as is necessary to fill posts. *Id.* ¶ 5. But Brakeall alleges that excessive overtime has an adverse effect on staff and leaves posts inadequately filled. Docket 94 ¶ 5.

Defendants allege that the staff level for East Hall was increased in July 2014 and the minimum staff levels for all units of the SDSP have been increased since Young became warden. Docket 78 ¶¶ 3, 4. But Brakeall believes staffing levels today are similar or less than what they were when he was incarcerated at SDSP from 1997-2005. Docket 94 ¶ 4.

Second, Brakeall alleges that the prison frequently engaged in a practice of stealing staff members from their station. Staff discussed stealing correctional officers from recreation, when correctional officers who are supposed to be monitoring the recreation building are taken to transport an inmate. Docket 40 ¶ 84. Even before stealing, correctional officers stated that the group assigned to the recreation building would not be enough. *Id.* On December 13, 2014, Brakeall alleges there were four correctional officers supervising over 200 inmates and parolees in the recreation building. East Hall houses nearly 400 offenders. *Id.* ¶ 99. On February 1, 2016, Brakeall

alleges that SDSP was operating with nine fewer officers than required on the day he was assaulted. *Id.* ¶ 53.

Defendants argue that there has been no increase in violence at the SDSP from January 2014 to December 2016. But Brakeall disputes this. He contends that violence has increased but victims simply do not report it to prison staff. Docket 94 ¶ 61. Victims do not want to be labeled a snitch or be moved to the SHU. *Id.* Brakeall claims he witnessed as many as twenty inmates taken to the SHU for fighting in East Hall in mid-March 2016. Docket 40 ¶ 125. And Brakeall contends there are assaults where an assailant cannot be identified so there is no write up. Docket 94 ¶60. These " 'paperless' incidents" may not get reported. *Id.*

At this stage, before discovery has begun, the court finds, viewing the facts and inferences from those facts in the light most favorable to Brakeall, that he has set forth sufficient facts to demonstrate a constitutional deprivation. In sum, material issues of fact remain concerning whether Kaemingk, Dooley, and Young had a policy of providing insufficient staffing resulting in unconstitutionally inadequate conditions of confinement, which policy was a moving force behind the attacks on Brakeall.

The second prong of the qualified immunity analysis asks whether "the right was clearly established at the time of the deprivation." *Howard*, 570 F.3d at 988. Again, the United States Supreme Court in *Farmer* held that the Eighth Amendment encompasses an inmate's right to be protected from harm by fellow inmates. 511 U.S. at 833. Brakeall identifies a clearly established

constitutional right, an inmate's right to be protected from harm by fellow inmates, that was allegedly violated by these defendants' failure to properly staff the prison leading to increased violence. *Farmer* clearly established that a "prison official may be held liable . . . if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. And the Eighth Circuit held, "Double celling is not unconstitutional for a general prison population absent deprivation of food, medical care, sanitation, increased violence, or other conditions intolerable for incarceration." *C.H. v. Sullivan*, 920 F.2d 483, 485 (8th Cir. 1991) (citing *Rhodes*, 452 U.S. at 347-48); *see also Kitt v. Ferguson*, 750 F. Supp. 1014, 1020–21 (D. Neb. 1990), *aff'd*, 950 F.2d 725 (8th Cir. 1991) (same).

The court finds that Brakeall has shown that the facts, viewed in the light most favorable to him, demonstrate he was deprived of a constitutional right, and that right was clearly established at the time of the deprivation. At this time, summary judgment is denied as to Kaemingk, Dooley, and Young, based on qualified immunity as to Brakeall's failure to properly staff SDSP.

### D. Motion to Appoint Counsel

Brakeall moves to appoint counsel. Docket 81, 85, 87. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant's civil case, the district court considers the complexity of the case, the ability of the indigent litigant to

investigate the facts, the existence of conflicting testimony, and the indigent's ability to present his claim. *Id.* Brakeall appears able to adequately present his § 1983 claims at this time. Thus, his motions to appoint counsel are denied.

## CONCLUSION

Brakeall sets forth facts sufficient to overcome the qualified immunity defense of defendants. Therefore, defendants' motion for qualified immunity is denied.

Thus, it is ORDERED

1. Defendants' motion for summary judgment based on qualified immunity (Docket 67) is denied.

2. Brakeall's failure to protect and failure to properly staff SDSP claims survive summary judgment.

3. Brakeall's motions to appoint counsel (Dockets 81, 85, 87) are denied.

4. All discovery in this matter will be completed on or before August 30, 2018.

5. All other motions, except motions in limine concerning questions of evidence, will be filed on or before September 30, 2018.

DATED this 23rd day of February, 2018.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE