UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WINSTON GREY BRAKEALL,<br><br>Plaintiff,<br><br>vs.<br><br>MIKE LEIDHOLT, SECRETARY OF CORRECTION FOR THE STATE OF SOUTH DAKOTA; IN HIS INDIVIDUAL CAPACITY; ROBERT DOOLEY, CHIEF WARDEN FOR THE SOUTH DAKOTA DEPARTMENT OF CORRECTIONS; IN HIS INDIVIDUAL CAPACITY; DARIN YOUNG, WARDEN AT SDSP; IN HIS INDIVIDUAL CAPACITY; DERRICK BIEBER, UNIT MANAGER AT SDSP; IN HIS INDIVIDUAL CAPACITY; TIM MEIROSE, UNIT MANAGER AT SDSP; IN HIS INDIVIDUAL CAPACITY; RYAN VANDERAA, SDDOC EMPLOYEE EMPLOYED AT SDSP, JPA, AND/OR UNIT C IN SIOUX FALLS, SOUTH DAKOTA; WILLIAM ALLEN, CORRECTIONAL OFFICER WITH THE RANK OF CORPORAL AT SDSP; IN HIS INDIVIDUAL CAPACITY; LT. R. BROWN, SDDOC EMPLOYEE EMPLOYED AT SDSP, JPA, AND/OR UNIT C IN SIOUX FALLS, SOUTH DAKOTA; IN HIS INDIVIDUAL CAPACITY; MAJOR STEVE BAKER, SDDOC EMPLOYEE EMPLOYED AT SDSP, JPA, AND/OR UNIT C IN SIOUX FALLS, SOUTH DAKOTA; IN HIS INDIVIDUAL CAPACITY; AND LT. CHAD ROTERT, SDDOC EMPLOYEE EMPLOYED AT SDSP, JPA, AND/OR UNIT C IN SIOUX | 4:16-CV-04057-KES<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDER ON SUBSTITUTION |

| FALLS, SOUTH DAKOTA; IN HIS INDIVIDUAL CAPACITY; | |
| Defendants. | |

Plaintiff, Winston Grey Brakeall, filed this lawsuit under 42 U.S.C. § 1983. Dockets 1, 40. Defendants filed their first motion for summary judgment based on qualified immunity on June 19, 2017. Docket 67. This court denied the motion. Docket 98. Defendants filed a second motion for summary judgment on November 11, 2018. Docket 121. Brakeall opposes this motion. Docket 175.

## ORDER ON SUBSTITION

Under Federal Rule of Civil Procedure 25(d), the court "may order substitution at any time" when a public officer is replaced. In January 2019, Governor Kristi Noem named Mike Leidholt as the new Secretary of the Department of Corrections. This court substitutes Mike Leidholt for defendant Dennis Kaemingk.

## FACTUAL BACKGROUND[1]

Viewing the evidence in light most favorable to Brakeall, as the non-moving party, the facts are:

On November 4, 2014, Brakeall was taken into custody on a warrant from the South Dakota Board of Pardons and Paroles (the Board). Docket 98 at

---

[1] Because defendants move for summary judgment, the court recites the facts in the light most favorable to Brakeall. Where the facts are disputed, both parties averments are included.

2. On December 11, 2014, Brakeall was transferred to East Hall at the Jameson Prison Annex (JPA) in the South Dakota State Penitentiary (SDSP). *Id.* After arriving at JPA, Brakeall told the admitting officer that he would not be safe in the general population in East Hall. *Id.* Brakeall then spoke to Unit Manager Tim Meirose and Brakeall informed Meirose that he would be at risk in the general population in East Hall. *Id.* Brakeall alleges that in 2014, Meirose knew that he was a "high-profile, high-risk, largely passive sex offender who had been assaulted previously." Docket 181 ¶ 29.

Brakeall claims that he immediately told Meirose about his fears of assault and claims that Meirose said that his "cellmate, Paul Hansen, was a 'good guy.'" *Id.* ¶ 30. Brakeall claims at this point, Meirose did not offer protective custody. *Id.* Also, Brakeall alleges that:

> Within minutes of reaching the cell, strange inmates were at the door asking why I was on their tier, when I was leaving, and how much I would pay not to get stabbed. I immediately reported this to staff and was told to 'tough it out' and 'give the room a try.' Nothing was done by Meirose or any staff member to protect me.

*Id.*

Defendants allege that Brakeall did not communicate a specific threat to Meirose and that he did not give more details or identify a specific inmate that he feared. Docket 122 at 11. Meirose told Brakeall that no other cells were available and offered him the options of accepting the assigned cell or going to the special housing unit (SHU) for refusing housing, a major rule violation. Docket 98 at 2. In order to protect his possibility of parole, Brakeall accepted his housing assignment in East Hall. *Id.*

As Brakeall got ready for breakfast the next morning, he heard other prisoners call him "Chomzilla," a sobriquet derived from "child molester," which references Brakeall's underlying conviction, and "Godzilla," which references Brakeall's immense size (Brakeall is 6' 9", 330 pounds). *Id.* at 3. This was an insult used against Brakeall during the sixteen years when he was previously incarcerated at SDSP. *Id.* After breakfast, Brakeall was confronted by his cellmate, a gang member. *Id.* The cellmate said he had been ordered to assault Brakeall, but had refused the order to save his parole eligibility. *Id.*

Later, Brakeall's cellmate was beaten by the gang for refusing to assault him. *Id.* Brakeall told prison staff about the threats against him, but nothing was done. *Id.* Brakeall did not want to cause trouble because he also wanted to save his parole eligibility. *Id.* At the time, he was still awaiting his parole revocation hearing. *Id.* Brakeall's cellmate told him that other prisoners were spreading rumors about Brakeall, saying he had been re-incarcerated because he had committed another sex offense. *Id.* The cellmate claimed the rumors were spread to encourage prisoners to assault Brakeall. *Id.*

I.     **First Assault**

On December 13, 2014, Brakeall was assaulted in the SDSP dining hall. *Id.* After the assault, while being evaluated by health services, an unknown correctional officer gave Brakeall three options: he could go back to his cell, he could refuse housing, or he could ask for protective custody in the SHU. *Id.* The officer told Brakeall that seeking protective custody "gives you kind of a reputation as a punk." *Id.* Thus, Brakeall returned to his cell. *Id.*

Brakeall claims he had to borrow another inmate's grievance form on Monday, December 15, 2014, in order to file a grievance against Meirose. Docket 180 ¶ 87. Brakeall's cellmate in December 2014, Jerry Craig, submitted a declaration stating he gave Brakeall a grievance form and that he "believe[d] he turned it in at lunch on Sunday." Docket 176-1 ¶ 5. Brakeall claims when he received a response he had just been transferred to parole. Docket 180 ¶ 87. Brakeall alleges that Unit Coordinator, Angie Steineke, refused to provide a form and said if Brakeall wanted to fight prison issues while he was on parole then he could go back to prison. *Id.* Brakeall contends that he did not pursue the second stage because of this threat. *Id.* Brakeall claims he lost the grievance in 2015 when he moved to JPA. *Id.*

Brakeall claims there is no true protective custody in the South Dakota Department of Corrections (DOC). Docket 98 at 4. To move into protective custody, an inmate must be willing and able to identify the threatening individuals. *Id.* Brakeall did not know the identities of the threatening individuals. *Id.* Brakeall had not yet spent enough time at SDSP to know or identify any of the gang members who were threatening him. *Id.*

Defendants aver that SDSP has an Operational Memorandum in place to protect inmates that believe they are in danger. *Id.* Defendants state, "If an inmate believes he is in danger he must notify a staff member who will immediately notify the officer in charge. The inmate can make this request without fear of being written up for a rule violation." *Id.* Brakeall also points out a provision in the memorandum that reads, "If staff becomes aware of an

inmate's need for protection, even though not requested, the same procedure for requested protective custody apply." *Id.* Brakeall acknowledges that the memorandum was in place but claims the staff was inadequately trained to implement it. *Id.* Defendants contend that an inmate has three options if they believe they are in danger: (1) stay in current location; (2) refuse housing and go to segregated housing (which is a rule violation and the inmate will be written up); or (3) request protective custody. Docket 129 ¶ 40. Defendants also allege that the Special Investigative Unit (SIU) conducts an investigation "to determine whether the inmate is in danger." *Id.* ¶ 42.

After the December 13, 2014 assault, the assailant told the unknown correctional officer that the threats against Brakeall from gangs in East Hall were severe. Docket 98 at 4. The officer then sent Brakeall to West Hall for his protection. *Id.* Despite the DOC policy requiring an incident report, no photographs of Brakeall's injuries or statements were taken by prison staff, and no incident report was made. *Id.* at 4-5. Defendants aver that the assailants are still unknown. *Id.* at 5. On December 14, 2014, Brakeall's arrest warrant was dropped, and he was placed on parole. *Id.* Two days later, he was transferred to the Unit C Trustee facility in the Community Transition Program (CTP). *Id.*

For most of April 2015, Brakeall was held in JPA. *Id.* He was threatened by other inmates and his belongings were stolen. *Id.* Again he told prison staff what was happening, but they did nothing. *Id.* Brakeall was later returned to the CTP program. *Id.* But on December 1, 2015, Brakeall was arrested again for

failing a polygraph test. *Id.* He was placed on administrative detainer and moved to general population in JPA. *Id.* The next day, he was transferred to East Hall. *Id.* Brakeall warned several members of prison staff, including Unit Manager Derrick Bieber, that he was in danger. *Id.* Bieber was aware that Brakeall had been previously assaulted in the East Hall shower in 2002. *Id.* Brakeall again was given the option of accepting his cell in East Hall or being written up and sent to the SHU. *Id.* In order to save his parole eligibility, he chose the former. *Id.*

In January of 2016, two inmates told Brakeall that the gangs in East Hall warned them not to associate with Brakeall and that the gangs were going to assault Brakeall or extort protection money from him. *Id.* at 6. They explained that because of Brakeall's size and the fact that he would not fight back in order to protect his parole eligibility, other prisoners planned to attack him to "make their bones" without fear that he would fight back. *Id.* Brakeall told Bieber about the threats and Bieber said he would "look into it." *Id.* When Brakeall told other correctional officers about the threats, they told him that without the names of inmates who were going to attack him, they could do nothing to protect him. *Id.*

## II.    Second Assault

On February 1, 2016, Brakeall was assaulted again. *Id.* He was in the recreation building, playing cards with another inmate when he was struck from behind and knocked to the floor. *Id.* There were no correctional officers in the card room. *Id.* Brakeall believes that he was beaten by three inmates for at

least one minute, where the assailants punched and kicked him in the head, back, and torso. *Id.* at 6-7. Defendants contend that video footage shows that two inmates assaulted Brakeall and the attack lasted seventeen seconds. *Id.* at 7. The attack did not stop until the assailants left on their own accord. *Id.* By the time the assault ended, Brakeall was bleeding profusely from his nose and head, and a fellow inmate worried that Brakeall's skull had been fractured. *Id.*

After the assault, Brakeall recovered his broken glasses and saw that no correctional officers or staff were present. *Id.* Brakeall, covered in blood and still bleeding, found a correctional officer and told him about the attack. *Id.* The officer called for an escort to take Brakeall to health services. *Id.* After several minutes, Lieutenant Ryan Vanderaa escorted Brakeall to health services. *Id.* Brakeall told Vanderaa that he wanted the attackers to be criminally charged because he was a parolee on an administrative detainer, not an inmate. *Id.* Vanderaa said that the attackers would be charged and that pictures of Brakeall's wounds and statements about the attack would be taken. *Id.* Health services bandaged Brakeall's wounds. *Id.* His injuries included:

> [A] deep trauma nose bleed; right temple laceration; left temple abrasion; extensive bruising and swelling of the left ear; extensive bruising to both forearms; abrasions on his right elbow; 'goose eggs,' pain and swelling at impact points across both temples, across the back and crown of his skull, at the base of the skull where the spine enters; muscular trauma to the neck, jaw, and torso; and bruising which reached Plaintiffs lower back.

*Id.* While being seen by health services, Brakeall complained of dizziness and nearly fell over multiple times. *Id.* at 8. No photos or statements were taken. *Id.* After Brakeall was seen by health services, Vanderaa handcuffed him and

brought him to the SHU for investigative purposes. *Id.* When they got to the SHU, Vanderaa was told that the inmates who attacked Brakeall were being taken to the SHU, so Vanderaa took Brakeall to the SHU main gate and put him in a holding cell. *Id.* Brakeall was still bleeding and asked prison staff for help, but they did nothing. *Id.* Forty minutes later, SHU Case Manager Lana Jackson came to the holding cell and told Brakeall that he was going back to East Hall. *Id.* After numerous attempts, the doctor stopped Brakeall's nose bleed. *Id.* The doctor ordered a CAT scan because Brakeall could not remember whether he was hit in the face, but the scan showed no fractures or internal hemorrhages. *Id.* at 8-9.

## III. The Third Assault

Brakeall claims his first "noticeable interaction" with Correctional Officer William Allen was when he was in route to receive medical care after the February 1, 2016 assault. Docket 180 ¶ 46. Brakeall states he "believes Allen would have heard threats and harassment directed at Brakeall from December 2015 to February 2016 while serving as corporal in East Hall." *Id.* After dinner on February 1, 2016, inmate George Dominguez told Brakeall that the gangs in East Hall wanted him out of East Hall and that he would be attacked if he went to recreation. Docket 98 at 10. That night, a nurse came to Brakeall's cell to deliver medication and told him to go to health services the next day. *Id.* Brakeall told the correctional officer who escorted the nurse about Dominguez's threats. *Id.* The correctional officer told Brakeall to tell staff in the morning. *Id.* On February 2, 2016, when Brakeall tried to go to health services, a

correctional officer in East Hall told him nobody needed to see him in health services. *Id.* When Brakeall told the correctional officer about the threats against him, the officer put his hand on his handcuffs and asked Brakeall, "Do you want to refuse housing?" *Id.* at 10-11. Brakeall returned to his cell. *Id.* at 11. Later that day, Brakeall went to recreation. *Id.*

There were four correctional officers supervising over 200 inmates and parolees in the recreation building. *Id.* at 11. Allen was stationed at the gate, and Brakeall told him about the most recent threats and that officers should keep their eyes open. *Id.* According to Brakeall, Allen agreed but did not ask any further questions. *Id.* Brakeall alleges that Allen violated the operational memorandum for when staff become aware of an inmate in danger. *Id.* at 11. Brakeall remained close to the officers until the threat was resolved. *Id.* Brakeall disputes the fact and claims Allen never told him to return to his cell or asked for more details about the threat. Docket 180 ¶ 50. Brakeall claims that the "visible bruising from the February 1 assault should have been adequate evidence to CO Allen that the reported threats had merit and required response." *Id.* Brakeall claims that Allen was aware that he had been assaulted the day before and that Allen had "seen [his] lacerations cauterized and helped clean up the blood." *Id.* ¶ 53.

Defendants claim that Allen asked Brakeall to identify the person, or persons, that he believed were going to harm him, but Brakeall said he did not know. Docket 98 at 11. Then Allen told him he could go to his cell to get away from the situation. *Id.* Brakeall went to the walking track. *Id.* There were no

cameras or officers in the walking track area. *Id.* Dominguez approached Brakeall. *Id.* Brakeall thought Dominguez was going to deliver an additional or more specific warning from a prison gang, but instead struck Brakeall in the throat with his forearm. *Id.* The strike raised a lump on the corner of his jaw and bruised his throat. *Id.* Brakeall went to the card room, found two officers there, and told them that Dominguez had assaulted him. *Id.* The officers told Brakeall to wait at the gate. *Id.* When Brakeall went to the gate, Dominguez approached and began circling Brakeall. *Id.* at 12. Officers arrived at the gate, handcuffed Dominguez, and removed him from the recreation building. *Id.* Then East Hall Case Manager Riley DeGroot arrived to escort Brakeall back to East Hall. *Id.* DeGroot said he could see a lump and bruising on Brakeall's throat where Dominguez had struck him. *Id.* Brakeall told DeGroot that Dominguez assaulted him because Dominguez feared the gangs in East Hall more than he feared the correctional officers. *Id.* If he assaulted Brakeall, Dominguez would be transferred out of East Hall and away from the gangs without repercussion. *Id.* DeGroot returned Brakeall to East Hall without bringing him to health services, taking statements from witnesses, or taking photos of Brakeall's injuries. *Id.*

That afternoon, Brakeall told Bieber about the assault and asked Bieber to put him on loss-of-recreation shower until the situation "cooled down." *Id.* Bieber refused. *Id.* When Brakeall pressed Bieber to protect him, Bieber said he would "look into it." *Id.* Bieber has not spoken to Brakeall since that day. *Id.* Brakeall spoke to Allen and Vanderaa about bringing charges against the

attackers, but they said that the Division of Criminal Investigation (DCI) would make those decisions, and they did not know anything about it. *Id.*

## IV.     Overtime and Staffing

Brakeall was incarcerated at SDSP from 1997-2005 and believes staffing levels today are similar or less than what they were then. *Id.* at 13. Yet defendants contend that the staff level for East Hall was increased in July of 2014 and the minimum staff levels for all units of the SDSP have been increased since Young became warden. *Id.* Defendants state that if a unit is below the minimum staffing level, additional staff will be moved to that unit to assure the minimum levels are complied with. *Id.*

The prison will pay as much overtime as is necessary to fill posts. *Id.* at 14. But Brakeall alleges that excessive overtime has an adverse effect on staff and leaves posts inadequately filled. *Id.* Brakeall also alleges that, under the direction of Kaemingk, various accounting tricks deflate occupancy levels and thus less staff is required. *Id.*

After the second assault, Brakeall alleges that while they waited for the results of the scan, correctional officers Allen and Zoss were discussing overtime work at the prison. *Id.* at 9. Defendants dispute that staffing issues were discussed in the presence of inmates. *Id.* Allen said he expected to do over twenty hours of overtime that week. *Id.* Both officers complained that supervisory personnel, Kaemingk, Robert Dooley, and Young, were aware of the staffing deficiencies but were unwilling to correct the problems. *Id.* Allen and Zoss also discussed the "stealing" of correctional officers from recreation when

an officer was needed to transport an inmate. *Id.* The correctional officers

stated that the group assigned to the recreation building would not have been

enough even before some were "stolen." *Id.* Inmates later told Brakeall that

SDSP was operating with nine fewer officers than were required on February 1,

2016. *Id.* He also learned that the staff member responsible for monitoring the

video feed in the recreation building was playing games on her phone. *Id.*

Under the 2016 Prison Rape Elimination Act (PREA) audit, "[t]he staffing

plan sets minimum required staffing for all essential areas of the prison for

each shift. Those minimum staffing numbers are usually always met." *Id.* The

minimum staffing level may not be met when an emergency situation arises

and staff responds to a different area. *Id.* But defendants contend this is rare

and someone is reassigned to cover as soon as possible. *Id.* Brakeall alleges

that the 2016 PREA audit done by defendants was fraudulent. Brakeall claims

that the PREA audit and information provided in discovery shows:

> [A] capacity in Sioux Falls of 2045 and occupancy of 1467, while the
> capacity figure provided in discovery was 1789 and count sheets'
> occupancy was 1515. This 304 'extra' bed discrepancy creates the
> illusion of a far emptier facility at 71% occupancy, which would
> obviously require far fewer guards to supervise than a more crowded
> building at 84% capacity. Nothing provided in discovery explains the
> loss of hundreds of cells or the discovery or so many inmates to fill
> them. The plaintiff contends the approved staffing policy was based
> on intentionally fraudulent figures and cannot be expected to be
> reliable or to protect staff, inmates, or the public.

Docket 180 ¶ 58. Defendants did not respond to Brakeall's questions in

interrogatories or in their reply brief when he asked why the numbers were

different. *See* Docket 186; Docket 110-3 at 1-2; Docket 110-4 at 1-2; Docket 110-5 at 1-2; Docket 110-6 at 2; Docket 110-7 at 1-2; Docket 110-8 at 2.

Defendants submitted an inmate-on-inmate incident report that covers January 2014 to December 2016. Docket 125 ¶ 5. Defendants allege that the report includes all inmate-on-inmate assaults that resulted in serious injury and assaults that did not result in serious injury. *Id.* The report claims that it does not include incidents where the "assailant is not known" and if the "incident is identified by self-report, there must be evidence beyond the victim's statement to substantiate the event." Docket 125-1 at 2. The inmate-on-inmate report submitted by defendants alleges that the numbers of assault with serious injury were 15 in 2014, 9 in 2015, and 15 in 2016. *See* Docket 125-2 at 1-2. Defendants further allege the total number of assaults without serious injury were 98 in 2014, 82 in 2015, and 84 in 2016. *Id.* And fights without serious injury totaled 100 in 2014, 90 in 2015, and 92 in 2016. *Id.* Brakeall alleges in his affidavit that the inmate-on-inmate report:

> [D]oes not include the number of inmates who were forced by their assailants to avoid meals and rec until black eyes faded. It also does not include the number of inmates who paid extortion to gang leaders to survive in their cells and avoid assault. This 'reasonable' and apparently acceptable level of assault which the defendants laud includes allowing three assaults on the plaintiff in 81 days, despite being warned that attacks were imminent.

Docket 176 at 11. Brakeall contends that this report "contains only assaults which were serious enough or obvious enough to force the victim to report them; volunteering that one has been assaulted results in being labeled a snitch and places the victim under universal threat." Docket 180 ¶ 78. Brakeall

claims sometime in 2006-2007 he was attacked from behind and suffered loose teeth and black eyes. Docket 181 ¶ 74. He claims that when the officers ran the footage they were unable to identify the assailant. *Id.* Brakeall questions "[s]ince there was no write-up, what would be placed in Ms. Edson's [inmate-on-inmate] report?" *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation omitted). The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*

§ 2725 at 93-95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48 (emphasis omitted).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved . . . in favor of either party." *Id.* at 250. Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "[W]hen dealing with summary judgment procedures technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

**ANALYSIS**

## I.     Defendants' Motion to Strike Plaintiff's Response

In their reply brief, defendants move to strike Brakeall's response to defendants' second motion for summary judgment. Docket 186 at 1-3. This court ordered Brakeall to file his response on or before May 21, 2019. Docket 157. Brakeall did not submit his response until July 30, 2019. Dockets 175, 176. This court agrees that Brakeall's filing was untimely but notes the "special problems faced by prisoners attempting to proceed pro se" as discussed in *Nickens*. 622 F.2d at 971. Thus, although Brakeall's response to defendants' second motion for summary judgment was untimely, this court will consider it.

## II.    Failure to Properly Staff SDSP

Brakeall alleges that Leidholt, Dooley, and Young violated his Eighth Amendment rights by failing to properly staff SDSP. Docket 98 at 23. He alleges that the understaffing led to his attacks. *Id.* He also alleges that he was injured more severely because his attacks were not stopped due to the insufficient number of staff at SDSP. *Id.*

To sufficiently allege that conditions of confinement violate the Eighth Amendment, a prisoner must assert the following: "(1) the alleged deprivation is, 'objectively, sufficiently serious,' resulting 'in the denial of the minimal civilized measure of life's necessities,' and (2) that the prison officials were deliberately indifferent to 'an excessive risk to inmate health or safety,' meaning that the officials actually knew of and disregarded the risk." *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825,

834 (1994)). Nonetheless, "the Constitution does not mandate comfortable prisons []." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

Thus, with regard to the first element, a prison condition is not deemed cruel and unusual unless it "inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 348; *see also id.* at 347 ("To the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."). Further, the objective factor

> requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling v. McKinney*, 509 U.S. 25, 36 (1993). In *Rhodes v. Chapman*, the court found that double celling did not constitute cruel and unusual punishment because there was a showing that it did not increase violence. *Rhodes*, 452 U.S. at 348 (The district court had made a finding of fact that double celling constituted cruel and unusual punishment).

To show that the deprivation was " 'objectively, sufficiently serious,' resulting 'in the denial of the minimal civilized measure of life's necessities,' " Brakeall sets forth allegations that call into question whether the staffing levels were adequate and whether records of assaults accurately reflect the number of assaults occurring in SDSP. *Williams*, 49 F.3d at 445 (quoting *Farmer*, 511 U.S. at 834). First, he claims defendants use various accounting maneuvers to

maintain staffing levels lower than is safe. Docket 98 at 24. Second, Brakeall alleges that, under the direction of Leidholt, defendants manipulated the occupancy levels and as a result the minimum staffing levels. *Id.*

Defendants submitted an inmate-on-inmate incident report that covers January 2014 to December 2016. Docket 125-2. Defendants allege that the report includes all inmate-on-inmate assaults that resulted in serious injury as well as assaults that did not result in serious injury. *See* Docket 125 ¶ 2. The report claims that it does not include incidents where the "assailant is not known" and if the "incident is identified by self-report, there must be evidence beyond the victim's statement to substantiate the event." Docket 125-1 at 1. The inmate-on-inmate report submitted by defendants alleges that the number of assaults with serious injury totaled 15 in 2014, 9 in 2015, and 15 in 2016. *See* Docket 125-2 at 1-2. Defendants further allege the total number of assaults without serious injury was 98 in 2014, 82 in 2015, and 84 in 2016. *Id.* And the fights without serious injury totaled 100 in 2014, 90 in 2015, and 92 in 2016. *Id.* Brakeall alleges in his affidavit that the inmate-on-inmate report:

> [D]oes not include the number of inmates who were forced by their assailants to avoid meals and rec until black eyes faded. It also does not include the number of inmates who paid extortion to gang leader to survive in their cells and avoid assault. This 'reasonable' and apparently acceptable level of assault which the defendants laud includes allowing three assaults on the plaintiff in 81 days, despite being warned that attacks were imminent.

Docket 176 at 11. Brakeall contends that this report "contains only assaults which were serious enough or obvious enough to force the victim to report

them; volunteering that one has been assaulted results in being labeled a snitch and places the victim under universal threat." Docket 180 ¶ 78. Brakeall claims sometime in 2006-2007 he was attacked from behind and suffered loose teeth and black eyes. Docket 181 ¶ 74. He claims that when the officers ran the footage they were unable to identify the assailant. *Id.* Brakeall questions "[s]ince there was no write-up, what would be placed in Ms. Edson's [inmate-on-inmate] report?" *Id.*

This case is similar to *Rhodes* where the policy required "the written reporting of any acts of violence." *Chapman v. Rhodes*, 434 F. Supp. 1007, 1018 (S.D. Ohio 1977). In *Rhodes*, the court found that because the very thorough reports did not show an actionable increase, it did not amount to an objective denial of minimal civilized measure of life's necessities. Here, defendants provided a report and Brakeall merely opposes this report with allegations rather than evidence. Although he identified an incident where he believes that the assault went unreported, it happened in 2006-2007, and defendants put forth a report that covers 2014-2016.

This court finds that Brakeall has stated mere allegations and has failed to raise a genuine dispute of a material fact regarding the first element of the conditions of confinement claim: an objective denial of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Because Brakeall has failed to state a material fact at issue regarding the first element, this court does not need to look at the deliberate indifference element. "The nonmoving party may not rest on mere allegations or denials, but must demonstrate on

the record the existence of specific facts which create a genuine issue for trial."
*Mosley*, 415 F.3d at 910 (internal quotation omitted). Defendants' motion for summary judgment on Brakeall's Eighth Amendment claim against Leidholt, Dooley, and Young is granted.

### III. Defendants claim Brakeall failed to exhaust his administrative remedies.

Defendants claim Brakeall failed to exhaust his administrative remedies for his failure to protect claims regarding Meirose, Bieber, and Allen. Docket 186 at 3.

The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 of this title or any other federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court."). The PLRA requires "immediate dismissal" of all unexhausted claims. *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005).

Before filing this action, Brakeall was required to fully and properly exhaust his administrative remedies as to each claim in the complaint. *See*

*Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003) ("If exhaustion was not completed at the time of filing, dismissal is mandatory."). The prisoner must exhaust his administrative remedies even if the precise relief he seeks is not available through the prison grievance system. *Booth*, 532 U.S. at 739-41. In order to properly exhaust administrative remedies, Brakeall must comply with the prison's procedures. *Woodford v. Nygo*, 548 U.S. 81, 102 (2006) ("[P]roper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures.). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

Defendants claim Brakeall failed to exhaust administrative remedies for his claim against Meirose. Specifically, defendants claim "[t]here is no record of a grievance, submitted by Brakeall, regarding an assault occurring in December 2014." Docket 129 ¶ 87. Brakeall claims he had to borrow another inmate's grievance form on Monday, December 15, 2014, in order to file a grievance against Meirose. Docket 180 ¶ 87. Brakeall's cellmate in December 2014, Jerry Craig, submitted a declaration stating he gave Brakeall a grievance form and that he "believe[d] he turned it in at lunch on Sunday." Docket 176-1 ¶ 5. Brakeall claims when he received a response he had just been transferred to parole. Docket 180 ¶ 87. Brakeall alleges that Unit Coordinator, Angie Steineke, refused to provide a form and said if Brakeall wanted to fight prison issues while he was on parole then he could go back to prison. *Id.* Brakeall

contends that he did not pursue the second stage because of this threat. *Id.* Brakeall claims he lost the grievance in 2015 when he moved to JPA. *Id.*

In *Ross v. Blake*, the United States Supreme Court held that an administrative remedy under the PLRA must be "available" to inmates. 136 S. Ct. 1850, 1859-60 (2016). The court noted three instances where the administrative remedy is unavailable, thus failure to exhaust in these situations does not end the claim: (1) "[w]hen despite what regulations or guidance materials may promise it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it [];" and (3) "[w]hen prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In *Gonzalez v. Berg*, this court ruled that when prison personnel refused to give the plaintiff a necessary form to appeal his grievances, this amounted to machination that would make the administrative remedy unavailable under *Ross*, and as a result the claim was not dismissed under § 1997e(a). No. 16-CV-4038, 2017 WL 52574, at *2 (D.S.D. Jan. 4, 2017). Here, Brakeall claims that Steineke refused to provide a form, therefore, like in *Gonzalez*, the administrative remedy was unavailable to him. Thus, Brakeall's claim against

Meirose is not dismissed due to failure to exhaust his administrative remedies and the merits of this claim will be considered on summary judgment.

Further, defendants claim that Brakeall failed to exhaust his administrative remedies for his claims against Bieber and Allen. Specifically, defendants claim Brakeall did not request a remedy regarding Bieber and Allen when he filed his grievances in 2016. Docket 186 at 3. Brakeall claims he filed a grievance on February 4, 2016, which describes the 2016 assaults and "refers to the 2014 attack and the staff's failure to respond according to policy." Docket 180 ¶ 90.

The South Dakota DOC has a two-step administrative remedy process for inmates: (1) informal resolution (informal resolution request) and (2) formal resolution (a request for administrative remedy). Administrative Remedy for Inmates Policy 1.3.E.2(4-5). The prison's Informal Resolution Request (IRR) form provides: "[s]tate your problem/complaint. Be specific, giving dates, times and places." Docket 1-1 at 1. Further, the Request for Administrative Remedy (AR) form provided to the inmates reads "[s]tate your problem, complaint and the action you request." *Id.* at 6. Both forms at the top indicate "[p]lease refer to DOC policy 1.3.E.2." *Id.* at 1, 9. The DOC policy indicates that for a request for administrative remedy, "the request will include information and facts supporting or justifying the exclusion, exception, accommodation, resolution or remedy requested by the inmate." Administrative Remedy for Inmates Policy 1.3.e.2(5)(C)(4).

In *Townsend v. Murphy*, the Eighth Circuit found that a prisoner did not exhaust his administrative remedies because the reprinted informal complaint given to the prisoner required the prisoner to include the name of the personnel. 898 F.3d 780, 784 (8th Cir. 2018). Here, Brakeall's reprinted informal and formal resolution forms did not state that he must request a remedy from a specific person. The DOC policy indicates that a requested remedy should be made, but even the policy does not include language that the remedy must name the individuals. Unlike in *Townsend*, Brakeall's preprinted request form the prison provides does not indicate that the prisoner must include the names of the individuals in the remedy being sought. Thus, this court finds that Brakeall exhausted his administrative remedies for his claims against Bieber and Allen.

## IV.     Failure to Protect[2]

Defendants move for summary judgment regarding Brakeall's failure to protect claims against Meirose, Bieber, and Allen. Docket 122 at 9. Brakeall alleges these defendants failed to protect him from being assaulted on three occasions. For the latter two assaults, Brakeall was a pretrial detainee. This part of his claim is analyzed under the Fourteenth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-57 (8th Cir. 2004) (citing *Ervin v. Busby*, 992 F.2d

---

[2] Defendants' second motion for summary judgment does not include Brakeall's failure to protect claims against Lt. Ryan Vanderaa, Lt. R. Brown, Major Steve Baker, Lt. Chad Rotert. Thus, Brakeall's failure to protect claims against Vanderaa, Brown, Baker, and Rotert are not discussed in this order and because defendants did not move for summary judgment regarding these claims, they will proceed to trial.

147, 150 (8th Cir. 1993) (per curiam) (finding that pretrial detainees' claims are evaluated under Due Process Clause rather than Eighth Amendment)).

Although the Eighth Circuit has not ruled on the amount of protection afforded to pretrial detainees under the Fourteenth Amendment Due Process clause, pretrial detainees like Brakeall have been afforded at least as much protection as under the Eighth Amendment. *Hartsfield*, 371 F.3d at 457. The Eighth Circuit has discussed the difference between the Eighth Amendment protection from cruel and unusual punishment and the Fourteenth Amendment protection from punishment prior to adjudication of guilt but has consistently applied the deliberate indifference standard "to pretrial detainee claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee from a serious risk of harm." *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"Prison conditions may be 'restrictive and even harsh.' " *Farmer*, 511 U.S. at 833 (quoting *Rhodes*, 452 U.S. at 347). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " *Id.* at 834 (quoting *Rhodes*, 452 U.S. at 347). That is not to say that every injury that is caused "at the hands of another" manifests into a constitutional violation. *Id.* Because being subjected to violent assault is not 'part of the penalty that criminal offenders [must] pay for their offenses,' '[t]he Eighth Amendment imposes a duty on the part of prison officials to protect prisoners from violence at the hands of other prisoners.' " *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010) (alternations in original) (quoting

*Farmer*, 511 U.S. at 834; *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998)).

A failure to protect claim is established when a plaintiff shows " 'that the prison official was deliberately indifferent to a 'substantial risk of serious harm.' " *Walls v. Tadman*, 762 F.3d 778, 782 (8th Cir. 2014) (quoting *Whitson*, 602 F.3d at 923). To show that there was a "substantial risk of serious harm," the plaintiff must show objectively that the "inmate is incarcerated under conditions" that pose "a substantial risk of serious harm." *Id.* Next, the plaintiff must show that the "prison official [subjectively] had a sufficiently culpable state of mind." *Id.* "[T]he state of mind is one of deliberate indifference to inmate health or safety. An official is deliberately indifferent if he or she actually knows of a substantial risk and fails to respond reasonably." *Id.*

Deliberate indifference is more than negligence. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In *Farmer*, the court describes deliberate indifference as when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. "Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843. "In order to have a viable deliberate indifference claim, a plaintiff is not required to allege and prove that

the defendant or defendants specifically knew about or anticipated the precise source of the harm." *Krein v. Norris*, 309 F.3d 487, 491-92 (8th Cir. 2002) (emphasis omitted) (commenting on the Supreme Court's holding in *Farmer v. Brennan*).

In *Blair v. Bowersox*, the Eighth Circuit explained that the hurdle of deliberate indifference is higher than a " 'should-have-known standard.' " 929 F.3d 981, 987 (8th Cir. 2019) (quoting *Letterman v. Does*, 789 F.3d 856, 861-62 (8th Cir. 2015)). The plaintiff must show that the defendant "had been exposed to information concerning the risk and thus must have known about it.'" *Id.* (internal quotations omitted). Next, the plaintiff must show that the defendant " 'deliberately disregarded the risk' " and the defendant knew his conduct was " 'inappropriate in light of the risk.' " *Id.* (quoting *Letterman*, 789 F.3d at 862). In *Blair*, the plaintiff warned the guards that:

> I told him I felt at the time or believed at the time it had something to do with my murder case, the case—the case that I'm doing time for. . . . I believe that my victim had some relatives at that institution. And that was maybe the reason why I was stabbed because I didn't know why I was stabbed. I just got here.

*Id.* at 984-85. The Eighth Circuit ruled that this statement was a non-specific suspicion and because the plaintiff had no evidentiary support beyond his suspicions he could not show that the officers were deliberately indifferent. *Id.* at 988.

In *Davis v. Scott,* the Eighth Circuit found that the plaintiff's concerns about being released to the general population were vague because he said he feared that the friends of his enemies would try to attack him. 94 F.3d 444, 445

(8th Cir. 1996). The court ruled that this was too vague and did not arise to deliberate indifference on the part of the defendants. *Id.* at 447.

In *Walls v. Tadman,* after the plaintiff was attacked, he declined protective custody but the prison officials placed him there anyway. 762 F.3d 778, 781 (8th Cir. 2014). When the prison officials investigated a potential threat and both parties involved denied that a problem existed, the officials could not be found to have displayed deliberate indifference when another attack occurred. *Id.* at 782.

In assessing whether Brakeall raises a genuine issue of material fact, the court finds *Young v. Selk* particularly instructive. 508 F.3d 868 (8th Cir. 2007). In *Young,* shortly after the plaintiff was moved into a cell, the plaintiff requested that the new cellmate keep the television volume low, and the cellmate shouted, "You don't tell me what to do or anything else," cursed at the plaintiff, and told the plaintiff that if he had a problem, the plaintiff would have to deal with the cellmate and his "boys." *Id.* at 870. The plaintiff reported the threat to a prison official that day and requested an immediate transfer to a new cell. *Id.* The next day he repeated the report to a second prison official. *Id.* at 870-71. Shortly after this second report, the cellmate and two other inmates attacked the plaintiff in his cell. *Id.* The Eighth Circuit stated that the cellmate's conduct was "the most probative evidence of the degree and type of risk that [the plaintiff] faced" and found that the assailant's conduct toward the plaintiff, by itself, raised a reasonable inference of a substantial threat of violence against the plaintiff. *Id.* at 872. Also, the court noted that because the

plaintiff had promptly reported the threat and then repeated it the next day, this strengthened the inference of a substantial risk of serious harm to the plaintiff. *Id.* at 872-73. Further, in *Berry v. Sherman*, the Eighth Circuit held that because the plaintiff rejected the opportunity for protective custody, he was not considered to be in a substantial risk of serious harm. 365 F.3d 631, 634 (8th Cir. 2004).

Thus, for Brakeall's failure to protect claims against Meirose, Bieber, and Allen to survive summary judgment he must show a genuine dispute of material fact regarding: (1) that his incarceration in East Hall posed a substantial risk of serious harm, and (2) Meirose, Bieber, and Allen knew of and disregarded that risk. *See Farmer*, 511 U.S. at 834.

### A. Unit Manager Tim Meirose

Brakeall alleges that in December of 2014, Meirose knew that Brakeall was a "high-profile, high-risk, largely passive sex offender who had been assaulted previously." Docket 181 ¶ 29. Brakeall claims that he immediately told Meirose about his fear of being assaulted in East Hall. *Id.* ¶ 30. Meirose told Brakeall that no other cells were available and offered him the options of accepting the assigned cell or going to the SHU for refusing housing, which is a major rule violation. Docket 98 at 2. In order to protect his possibility of parole, Brakeall accepted his housing assignment in East Hall. *Id.* Meirose allegedly said his "cell mate, Paul Hansen, was a 'good guy'. " Docket 181 ¶ 30. Brakeall claims Meirose did not offer protective custody to him. *Id.* Further, Brakeall alleges that:

> Within minutes of reaching the cell, strange inmates were at the door asking why I was on their tier, when I was leaving, and how much I would pay not to get stabbed. I immediately reported this to staff and was told to 'tough it out' and 'give the room a try.' Nothing was done by Meirose or any staff member to protect me.

*Id.* Brakeall was assaulted in the dining hall on December 13, 2014. Docket 180 ¶ 31.

Defendants argue that Brakeall did not communicate a specific threat to Meirose and that he did not give more details or identify a specific inmate that he feared. Docket 122 at 11. In *Krein*, the court ruled that the "plaintiff is not required to allege and prove that the defendant or defendants specifically knew about or anticipated the precise source of the harm." 309 F.3d at 491 (emphasis omitted). Although the plaintiff does not need to show the source of the harm, he needs to at least establish that there is a substantial risk of serious harm in the first place. This is where Brakeall fails to establish a genuine dispute of material fact. To show a substantial risk of serious harm, Brakeall must show objectively that he was "incarcerated under conditions" that pose "a substantial risk of serious harm." *Walls*, 762 F.3d at 782.

In order to raise a genuine dispute of material fact regarding deliberate indifference of a substantial risk of serious harm, Brakeall must allege more than mere suspicions or a generalized fear of harm. In *Blair*, the court found that a non-specific "suspicion" without any evidentiary support beyond the suspicion did not create a substantial risk of serious harm to which the officers could have been deliberately indifferent. *Blair*, 929 F.3d at 988. Here, Brakeall's fears of assault are non-specific and mere suspicions. Brakeall told

Meirose he feared being assaulted and that he was asked "how much [] [he] would pay to not get stabbed." Docket 181 ¶ 30. This court does not make light of a prisoner getting asked how much they would pay to not get stabbed, but this threat is not specific enough to show an objective substantial risk of serious harm to which Meirose was deliberately indifferent.

Further, this situation is similar to that of *Davis*, where the plaintiff said he feared the friends of his enemies would try to attack him and the court found that this was too vague and did not give rise to deliberate indifference of a substantial risk of serious harm. *Davis*, 94 F.3d at 445. Brakeall's situation is different than the scenario in *Young* where the prisoner's roommate was the one doing the threatening and specified that if the plaintiff had a problem with him than he would have to deal with him and his "boys." *Young*, 508 F.3d at 870.

Viewing the facts in light most favorable to Brakeall, he has failed to raise a genuine dispute of material fact as to whether there was a substantial risk of serious harm and whether Meirose was deliberately indifferent to that risk. Thus, Meirose's motion for summary judgment on Brakeall's failure to protect claim is granted.

### B. Unit Manager Derrick Bieber

In April of 2015, Brakeall warned several members of prison staff, including Bieber, that he was in danger. Docket 98 at 5. Bieber was aware that Brakeall had been previously assaulted in the East Hall shower in 2002. *Id.* Brakeall claims he reminded Bieber that he has been beaten in 2014. Docket

181 ¶38. Objectively, Brakeall's housing assignment among the general population in East Hall, in a housing unit where he was known as Chomzilla and where he had previously been assaulted, placed Brakeall at substantial risk of serious harm. Brakeall again was given the option of accepting his cell in East Hall or being written up and sent to the SHU. Docket 98 at 5. In order to save his parole eligibility, he chose the former. *Id.*

In January of 2016, two inmates told Brakeall that the gangs in East Hall warned them not to associate with Brakeall and that the gangs were going to assault Brakeall or extort protection money from him. Docket 98 at 6. They explained that because of Brakeall's size and the fact that he would not fight back in order to protect his parole eligibility, other prisoners planned to attack him to "make their bones" without fear that he would fight back. *Id.* Brakeall told Bieber about the threats and Bieber said he would "look into it." *Id.* When Brakeall told other correctional officers about the threats, they told him that without the names of inmates who were going to attack him, they could do nothing to protect him. *Id.*

On February 1, 2016, Brakeall was assaulted. *Id.* Defendants argue that before the second assault, Brakeall communicated a general fear of harm that did not have a basis. Docket 122 at 11. Defendants argue that there "is nothing in the record to support his argument that the assault in 2014 had anything to do with prior threats he had received." *Id.*

Defendants allege that before the second assault and after telling officers about the threats, Brakeall did not request protective custody even though he

was aware that the had the option of going into protective custody. *Id.* at 13. Defendants contend that an inmate has three options if he believes he is in danger: "[1] stay in his current location; [2] he can refuse housing and go to segregated housing unit (SHU), which is a rule violation; or [3] he can request protective custody." Docket 129 ¶ 40. Defendants also allege that the Special Investigative Unit conducts an investigation "to determine whether the inmate is in danger." *Id.* ¶ 42.

Defendants claim that Brakeall did not request protective custody from Bieber, however, their own Operational Memorandum reads, "If staff become aware of an inmate's need for protection, even though not requested, the same procedures for requested Protective Custody apply." Docket 126-1 at 1. Brakeall disputes that protective custody was an actual option when it was suggested after the first assault. Brakeall alleges that he was threatened with protective custody when the officer in charge said a "target" would be placed "on him as a snitch and a punk, suggesting that the only viable options if he wanted to survive were refusing housing or going back to his cell . . . . This was the only time plaintiff was ever offered protective custody at SDSP." Docket 180 ¶ 31.

Brakeall claims that when staff refuse to provide protective custody or refuse to investigate the threats it forces the inmate to refuse housing. Docket 180 ¶ 33. But if he refuses housing, he would receive a refusing housing write-up which is a major rule violation and according to Brakeall "prima facie cause to revoke his parole." *Id.* (emphasis omitted). Because refusing housing would

affect his eligibility for parole, Brakeall argues this is not a legitimate option. At this time, Brakeall was a parolee and was waiting to be released back into the community. *Id.*

Defendants cite *Dale v. Poston*, and argue that "[p]rison officials do not violate the Eight [sic] Amendment because the mode of protection they offer does not sit well with a prisoner. Rather, if they offer reasonable protection from the threat, they have done their duty." Docket 122 at 13 (citing 548 F.3d 563, 570 (7th Cir. 2008)). The court finds there is a factual dispute as to whether Brakeall was offered protective custody, and instead, only offered the choice of refusing housing. It is up to the jury to determine whether this is a reasonable protection from threat under the circumstances.

Brakeall's fear of assault became more specific when he told Bieber about the threats he had received (gang threats, extortion threats, and the gang wanted to "make their bones"). Docket 98 at 6. Even though Brakeall was not able to identify the source of the threat, the instant case shares significant characteristics with *Young*. *See Young*, 508 F.3d at 870. As in *Young*, Brakeall was threatened with bodily harm and reported it multiple times to staff. Brakeall was the victim of an assault in 2014 in East Hall and had been approached by multiple inmates warning him of a forthcoming assault. Docket 98 at 20. In *Krein*, the court held that the plaintiff is not required to prove that the defendant knew of the precise source of the harm in order to establish deliberate indifference. *Krein*, 309 F.3d at 491-92.

Viewed in the light most favorable to Brakeall, there remains a genuine dispute of material fact as to whether Bieber was deliberately indifferent to a substantial risk of serious harm. Thus, defendants' motion for summary judgment on this issue as to Bieber is denied.

### C. Correctional Officer William Allen

Brakeall claims his first "noticeable interaction" with Allen was when he was in route to receive medical care after the February 1, 2016 assault. Docket 180 ¶ 46. Brakeall states he "believes Allen would have heard threats and harassment directed at Brakeall from December 2015 to February 2016 while serving as corporal in East Hall." *Id.*

After dinner on February 1, 2016 (one day after the second assault), inmate George Dominguez told Brakeall that the gangs in East Hall wanted him out of East Hall and that he would be attacked if he went to recreation. Docket 98 at 10. That night, a nurse came to Brakeall's cell to deliver medication and told him to go to health services the next day. *Id.* Brakeall told the correctional officer who escorted the nurse about Dominguez's threats. *Id.* The correctional officer told Brakeall to tell staff in the morning. *Id.* On February 2, 2016, when Brakeall tried to go to health services, a correctional officer in East Hall told him nobody needed to see him in health services. *Id.* When Brakeall told the correctional officer about the threats against him, the officer put his hand on his handcuffs and asked Brakeall, "Do you want to refuse housing?" *Id.* at 11. Brakeall returned to his cell. *Id.* Later that day, Brakeall went to recreation. *Id.*

That day there were four correctional officers supervising over 200 inmates and parolees in the recreation building. *Id.* Allen was stationed at the gate, and Brakeall told him about the most recent threats and that officers should keep their eyes open. *Id.* According to Brakeall, Allen agreed but did not ask any further questions. *Id.* After talking to Allen, Brakeall went to the walking track. *Id.* There were no cameras or officers in the walking track area. *Id.* Dominguez approached Brakeall. *Id.* Brakeall thought Dominguez was going to deliver an additional or more specific warning from a prison gang, but instead struck Brakeall in the throat with his forearm. *Id.* The strike raised a lump on the corner of his jaw and bruised his throat. *Id.* Brakeall went to the card room, found two officers there, and told them that Dominguez had assaulted him. *Id.* The officers told Brakeall to wait at the gate. *Id.* When Brakeall went to the gate, Dominguez approached and began circling Brakeall. *Id.* at 12. Officers arrived at the gate, handcuffed Dominguez, and removed him from the recreation building. *Id.*

Defendants claim that "[a]t no time did Brakeall make a request to Allen about being placed in protective custody. If he had made that request Allen would have immediately followed protocol and informed the Officer in Charge of the request." Docket 129 ¶ 53. But Brakeall argues that when an officer becomes aware of a threat to an inmate, the protective custody protocol should be followed even if not requested. Docket 126-1 at 1. Defendants claim that Allen asked Brakeall to identify the person, or persons, that he believed were going to harm him, but Brakeall said he did not know. Defendants claim that

Allen told him he could go to his cell to get away from the situation. Docket 98 at 11. Brakeall disputes the fact and claims Allen never told him to return to his cell or asked for more details about the threat. Docket 180 ¶ 50. Brakeall claims that the "visible bruising from the February 1 assault should have been adequate evidence to [] Allen that the reported threats had merit and required response." *Id.* Brakeall claims that Allen was aware that he had been assaulted the day before and that Allen had "seen [his] lacerations cauterized and helped clean up the blood." *Id.* ¶ 53.

Defendants argue that Brakeall could not identify the inmates that assaulted him on February 1, 2016. Docket 122 at 11. Further, defendants contend that when Brakeall reported the threats after the second assault he did not provide the identity of the inmate threatening him and there "was no way for prison staff to investigate Plaintiff's allegations." *Id.*

Here, defendants allege that if the prisoner cannot identify the name of a potential assailant the SIU will ask the prisoner to describe the assailant "that would help to identify the person or persons that is putting the inmate in fear of his safety." Docket 129 ¶ 67. But the court in *Krein* held that to make a deliberate indifference claim the plaintiff does not need to prove the defendants knew of the precise source of the harm. *Krein*, 309 F.3d at 491-92. Defendants claim that Brakeall did not request to be placed in protective custody, and if he had then Allen would have followed protocol. Docket 129 ¶ 53. But Brakeall does not need to request protective custody if the officer is aware of the threats under the prison's operational procedures. *See* Docket 126-1 at 1. Here,

defendants dispute that they acted with deliberate indifference towards Brakeall's serious risk of harm. Even though Brakeall was not able to identify the source of the threat, the instant case shares significant characteristics with *Young*. As in *Young*, Brakeall was threatened with bodily harm and reported it multiple times to Allen. Brakeall claims that Allen knew about the second assault because he was with him in route to receive medical care after the incident and he could see the bruising the next day. Docket 180 ¶ 46. Further, Brakeall claims that he told Allen of the threats he had heard from Dominguez. Docket 98 at 11.

Viewed in the light most favorable to Brakeall, there remains a genuine dispute of material fact of whether Allen was deliberately indifferent to a substantial risk of serious harm. Thus, Allen's motion for summary judgment on this claim is denied.

## CONCLUSION

Thus, it is ORDERED:

1. Mike Leidholt is substituted for Dennis Kaemingk.

2. Defendants' motion for summary judgment (Docket 121) on Brakeall's Eighth Amendment claim on conditions of confinement against Leidholt, Dooley, and Young is granted.

3. Defendants' motion for summary judgment (Docket 121) on Brakeall's claim of failure to protect against Meirose is granted.

4. Defendants' motion for summary judgment (Docket 121) on Brakeall's claim of failure to protect against Allen and Bieber is denied.

5. The claims moving forward are Brakeall's failure to protect claims against Allen, Bieber, Vanderaa, Brown, Baker, and Rotert.

6. Brakeall's motion for leave to file surreply (Docket 193) to the defendants' second motion for summary judgment is moot.

Dated September 27, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE